[Cite as *State v. Vinson*, 2022-Ohio-2031.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                                   :

     Plaintiff-Appellee,                            :

                                                      No. 19AP-574

v.                                                              :       (C.P.C. No. 17CR-6989)

Darnell D. Vinson,                                              :       (REGULAR CALENDAR)

     Defendant-Appellant.                           :

---

D E C I S I O N

Rendered on June 16, 2022

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Darnell D. Vinson, appeals from the judgment of the Franklin County Court of Common Pleas entered after he was convicted on multiple counts of murder, felony murder, attempted murder, and felonious assault, all with firearm and criminal gang specifications, and two counts of having a weapon while under disability. Mr. Vinson's appeal challenges the legal sufficiency and manifest weight of the state's evidence, as well as the trial court's failure to provide a jury instruction on transferred intent self-defense. Finding no merit to these claimed errors, we affirm the judgment of the trial court.

{¶ 2} The state's indictment described various crimes of violence against five different victims on two separate dates. On December 10, 2017, Mr. Vinson was accused of having committed murder under R.C. 2903.02 by purposely causing the death of Kieara

Hobbs, felony murder under R.C. 2903.02 by causing her death as the proximate result of felonious assault under R.C. 2903.11, attempted murder and felonious assault of victim C.B., and attempted murder under felonious assault of victim L.D.  On December 11, 2017, Mr. Vinson was accused of having committed murder under R.C. 2903.02 by purposely causing the death of Brandon Meeks, felony murder under R.C. 2903.02 by causing his death as the proximate result of felonious assault, and attempted murder and felonious assault of victim D.M.  Each count carried a firearm specification under R.C. 2941.145(A) and a criminal gang activity specification under R.C. 2941.142(A).  Additionally, the indictment alleged two counts of having a weapon while under disability in violation of R.C. 2923.13.

{¶ 3}  The state presented evidence that the first incident occurred in the early morning hours of December 10, 2017, at the Exhale Hookah Lounge.  T.M testified that she was visiting her friend Kieara Hobbs in Columbus on December 9, 2017.  (Tr. Vol. 6 at 1116.)  After going out to several clubs and bars, T.M., Kieara Hobbs, L.D., and C.B. arrived at the Exhale Hookah Lounge "somewhere around" 2:30 or 3:00 a.m.  *Id.* at 1116-19.  All four of them were "patted down" and "wanded" by security upon arrival, and T.M. testified that none of them had a weapon.  *Id.* at 1120.  After about ten minutes, the group moved from the front to the back of the lounge, near a pool table.  *Id.* at 1121.  Within ten minutes, T.M. saw "a man with a black hoodie and a gun in his hand" opening fire at them.  *Id.* at 1123.  T.M. went to Kieara Hobbs and "was trying to get her up," but "knew she was gone."  *Id.* at 1125.  She went outside to try to get into the car where her phone was located, but then "couldn't get back into the building because it was a crime scene."  *Id.*  T.M. testified that she was able to "get a good look" at the shooter and identified him as Mr. Vinson.  *Id.* at 1124, 1130.  T.M. saw no weapon that night other than the one in Mr. Vinson's hand.  *Id.* at 1131.

{¶ 4}  S.F. testified that he had seen Mr. Vinson, who he knew only by his "street name" of "Black," for several years before the shooting in the company of "Little B," whose real name was Brandon Meeks.  (Tr. Vol. 5 at 1017-19.)  According to S.F., both Black and Little B claimed to be members of the Deuce Deuce gang.  *Id.* at 1020.  S.F. was present at the Exhale Hookah Lounge at the time of the shooting.  *Id.* at 1022.  In spite of the lounge's security subjecting customers to inspection by "pat-down," S.F. had seen customers inside

with guns. *Id*. at 1023. That night, he saw Brandon Meeks and Mr. Vinson at the lounge, and he described Mr. Vinson as wearing "a black, dark black, grayish hoodie." *Id*. at 1025. S.F. saw Mr. Vinson "standing around, pacing back and forth" by the pool table. *Id*. at 1028.

{¶ 5} S.F. stated that he saw Mr. Vinson shoot a gun and believed that he heard five shots from the weapon, although he was "not positive" about the exact count. *Id*. at 1029-30. He could tell that Mr. Vinson was shooting "[t]owards where the couches were." *Id*. at 1033. S.F. did not see any of the victims arguing, yelling, or threatening Mr. Vinson or Brandon Meeks before the shooting. *Id*. at 1031. Nor did he see any of them with a firearm. *Id*. When S.F. looked up from the floor after the shots were fired, Mr. Vinson was gone. *Id*. at 1032. He went to check on the victims and did not see any of them with a weapon. *Id*. at 1051. He also identified Mr. Vinson on a security video of the incident. *Id*. at 1050. S.F. stated that he was testifying pursuant to a cooperation agreement in exchange for a plea deal on several drug trafficking charges. *Id*. at 1039-41.

{¶ 6} Officer Joshua Jarrell was on patrol with his partner during the early morning hours of December 10, 2017, when he responded to a call that "multiple people" had been shot at the Exhale Hookah Lounge. *Id*. at 979. After entering, he ordered the "20 to 30 people" still inside to get on the ground. *Id*. at 980. Officer Jarrell was informed that the shooter "had already left and the victims were in the back of the lounge." *Id*. at 981. Back there, he found one female victim and two male victims, all shot in the head. *Id*. at 982-83. The female victim was completely unresponsive, and Officer Jarrell believed she was dead. *Id*. at 983. He checked all of the victims for weapons and found none. *Id*. at 984-85. Other officers arrived and patted down the patrons who remained, but no weapons were found. *Id*. at 986. A portion of the officer's body-worn camera was played for the jury. *Id*. at 992; State's Ex. V.

{¶ 7} A number of .40 caliber spent shells and one live bullet were recovered from the pool room, as well as a bullet from Kieara Hobb's body. (Tr. Vol. 6 at 1165-67.) They were determined to have been fired from the same weapon, although the weapon itself was never uncovered during the investigation. *Id*.

{¶ 8} Separately, the state presented evidence of a residential shooting on December 11, 2017. S.M. testified that she was the wife of D.M., Brandon Meek's brother. (Tr. Vol. 4 at 703.) On December 11, 2017, she, D.M., and her five kids went to 284 East

Barthman Avenue, where Brandon Meeks lived. *Id.* at 703, 713. Mr. Vinson was at the house as well. *Id.* at 704. S.M. had "seen him a few times, but * * * didn't know him," although she did know him as "Black." *Id.* S.M. testified that Mr. Vinson had "two different guns" at Brandon Meek's house: "One was big, one was small with a round something on it." *Id.* at 705. S.M. stated that she did not have a gun and that she did not argue with Mr. Vinson before the shooting. *Id.* at 706. She testified that Mr. Vinson fired the gun at herself, D.M., and their children. *Id.* at 707. She saw Brandon Meeks standing close to Mr. Vinson "[b]y the front door" at the time of the shooting but did not see Mr. Vinson shoot him. *Id.* at 707-08. She fled to the basement after the shooting started and when she came back upstairs, Brandon Meeks was lying on the floor. *Id.* 708-10. When police arrived, she identified Mr. Vinson as the shooter and could not find her husband, who was found one street over "inside a building." *Id.* at 715-16. According to S.M., her husband "was shot in the back of the head and it came out through his face, and he was shot in the back." *Id.* at 725. As a result, he "had a hole in the side of his face" from the shooting. *Id.* at 716.

{¶ 9} Officer Joseph Curmode of the Columbus Police Department responded to a 911 call about the shooting. (Tr. Vol. 3 at 426.) When he and two other officers arrived, "the door to the house opened up and there was a female screaming that someone had been shot inside." *Id.* As the officers approached, "a bunch of kids and other adults" began exiting the house. *Id.* at 427. When Officer Curmode entered, he saw a body "right in front of the front door" that was "kind of on its side" and "wasn't moving." *Id.* at 428. He began to escort the screaming woman, who was S.M., to a cruiser to interview her when she identified the shooter in the alley. *Id.* at 429. Officer Curmode "took off running around the side of the house to apprehend him." *Id.* at 429-30.

{¶ 10} When he arrived behind the house, Officer Curmode saw Mr. Vinson fall to the ground. *Id.* at 430. The officer held him at gunpoint until other officers arrived to help handcuff him. *Id.* According to Officer Curmode, Mr. Vinson "immediately began stating that he had shot the people inside the house," and that the gun was located "by a garage between a garage and a car." *Id.* at 430-31. The gun was located "about 15 feet" from Mr. Vinson. *Id.* at 431. The gun had a "drum magazine," which Officer Curmode described as "an extended capacity magazine" capable of holding "extended rounds." *Id.*

{¶ 11} Mr. Vinson told the officers that his leg was broken, and Officer Curmode accompanied him to the hospital for treatment. *Id.* at 432-33. Officer Curmode authenticated his body-worn camera footage of the encounter, which was played for the jury. *Id.* at 437-491; State's Ex. B. In the exchange with officers on the video, Mr. Vinson denied being known under the street name "Black." *Id.* at 455. He also stated that he shot both D.M. and Brandon Meeks, identified the gun he used, and claimed they both "tried to kill" him. *Id.* at 456-58. Mr. Vinson told Officer Curmode that he "made sure" that Brandon Meeks "was dead. The other brother, he ran that way. The blood should be on the door." *Id.* at 461. He claimed that S.M. had a gun and had "upped" it "in front of" him right before he shot Brandon Meeks, asserting that the shooting "was self-defense." *Id.* at 473, 483-84. When asked how he broke his leg, Mr. Vinson replied that he "jumped out the window, yes, with a gun in my hand." *Id.* at 486. Mr. Vinson also claimed that Brandon Meeks had "killed the lady * * * in the pool hall." *Id.* at 448. However, at the hospital, Mr. Vinson stated: "I didn't mean to kill that girl." *Id.* at 502.

{¶ 12} Officer Emanuel Woods is a patrol officer for the Columbus Division of Police who was assigned to its gang unit. (Tr. Vol. 4 at 603-04.) During his assignment, and even before while on patrol, Officer Woods had talked to Mr. Vinson "over 10 times" and knew him by the street name "Black." *Id.* at 609. Mr. Vinson had identified himself to Officer Woods as a member of the Bloods street gang. *Id.* at 612. He was present when Mr. Vinson was interviewed in the hospital and authenticated a recording of the interview that was played for the jury. *Id.* at 616; State's Ex. A.

{¶ 13} During the interview, Mr. Vinson admitted that Brandon Meeks was dead "[b]ecause of me." *Id.* at 621. When asked if he had meant to hurt the woman shot at the Exhale Hookah Lounge, Mr. Vinson replied that he had not, and that it "was just pure accident." *Id.* at 625. He claimed that he was trying to shoot a "little light-skinned" man who "had his gun already out." *Id.* at 626. Mr. Vinson stated: "I didn't know there was a girl right there. * * * I shot the girl on accident." *Id.* at 632. He admitted that he fired the gun three times and that one of the shots hit her. *Id.* at 633. When asked about the shooting of Brandon Meeks and D.M. the next day, Mr. Vinson stated that he shot Brandon Meeks "twice in the neck" and shot D.M. "six times" as "[h]e was running to the back door." *Id.* at 647-48. He claimed that S.M "had a little silver gun" and had also fired shots at him, and

that Brandon Meeks also had a gun, which he described as a Glock with a 30-round magazine. *Id.* at 658-60.

{¶ 14} Homicide Detective Arthur Hughes testified that he followed a "blood trail" from 284 East Barthman Avenue to a nearby community center, where D.M. was found with "flesh coming off his face from [a] gunshot wound." (Tr. Vol. 6 at 1236-37.) D.M. was taken to a hospital for treatment. *Id.* at 1237. The detective found "a piece of flesh" behind 284 East Barthman Avenue that was consistent with the injury to D.M. *Id.* at 1238.

{¶ 15} Detective Larry Shoaf of the Columbus City Police Crime Scene Search Unit collected evidence from the shooting at 284 Barthman Avenue. (Tr. Vol. 4 at 769, 771.) He testified that he found a revolver "in the coat jacket pocket" of the victim, Brandon Meeks, with only "live rounds in the cylinder." *Id.* at 815, 817. There was no evidence that the revolver had been fired. *Id.* at 817.

{¶ 16} The weapon that Mr. Vinson admitted to firing inside 284 Barthman Avenue and located by Officer Curmode was a Glock 19 9mm with an extended drum magazine. (State's Ex. F-6; Tr. Vol. 4 at 838 (testimony of forensic investigator identifying "the firearm [found] between the Cadillac and the garage with the drum"); *see also id.* at 795 (testimony of Detective Shoaf identifying photos of the firearm taken prior to evidence collection)). Brian Johnson, a forensic scientist in the Firearms Identification Unit of the Columbus Police Crime Lab, testified that the cartridge casings collected from the home were fired from that firearm. (Tr. Vol. 5 at 907, 934-35.) Cartridge casings collected from the Exhale Hookah Lounge after the shooting there were not fired by that weapon. *Id.* at 955. Nor were they fired from another weapon collected from the lounge. *Id.* However, the casings collected at the lounge "were all fired from the same firearm," but that weapon was never discovered. *Id.*

{¶ 17} Mr. Vinson testified in his own defense. (Tr. Vol. 7 at 1442.) He stated that he was 20 years old at the time of the shooting, had been affiliated with the Deuce Deuce Bloods gang ever since he could remember, and that his street name was "Black." *Id.* at 1444-46, 1463. According to Mr. Vinson, he was "shooting dice" at the Exhale Hookah Lounge when C.B., one of the shooting victims with T.M., got into a "confrontation" with Brandon Meeks. *Id.* at 1450-51. He testified that C.B. "was talking aggressive," threatening "to kill somebody or blow somebody['s] head off," and brandishing a weapon. *Id.* at 1452.

Mr. Vinson's reaction when he saw the weapon was: "I felt like I needed to defend my life." *Id.* Mr. Vinson stated that he had smuggled a gun into the lounge by hiding it in his shoe. *Id.* at 1475. He admitted that he "opened fire" and then "left the scene," and that he was the shooter in the surveillance video. *Id.* at 1451-52. Mr. Vinson stated that he did not realize that he had shot anyone until the next day and that killing Kieara Hobbs "was an accident. I didn't really mean to intentionally do that to her." *Id.* at 1453.

{¶ 18} Mr. Vinson testified that he went to 284 Barthman Avenue the next day to smoke marijuana with his "close friend" Brandon Meeks and to sell drugs out of the house. *Id.* at 1454. He stated that after one transaction, Brandon Meeks demanded money from him, and they began "arguing." *Id.* at 1458-59. Mr. Vinson stated that he saw S.M., who he described as "old girl," with a gun that she fired. *Id.* at 1459, 1469. He admitted that he then shot Brandon Meeks and hid behind a wall. *Id.* Mr. Vinson claimed that when he came out, D.M. came at him with a gun, so he shot him. *Id.* D.M. ran "towards the back door," opened it and turned around, and Mr. Vinson "start[ed] shooting again" before D.M. "finally ran out the door." *Id.* After that, Mr. Vinson ran upstairs and jumped out of the window because he "didn't know where the girl was" and was afraid she would shoot him. *Id.* at 1459-60.

{¶ 19} On cross-examination, Mr. Vinson admitted that even though he had spoken to the police multiple times about the shooting at the Exhale Hookah Lounge, he never told the police that Brandon Meeks had a confrontation with C.B. there, or that C.B. had threatened to kill someone. *Id.* at 1464-65. Nor did he tell the police that S.M. had a gun and shot at him at 284 Barthman Avenue. *Id.* at 1474. When confronted with the fact that at the lounge he had fired a gun seven times at people five or six feet away, Mr. Vinson claimed that he didn't know he had shot anyone. *Id.* at 1468. Mr. Vinson admitted that he had lied to police about being at the lounge, the color of clothes he was wearing that night, and whether it was him on the surveillance video by the pool table. *Id.* at 1479. He conceded that he had lied because he "didn't want to get caught." *Id.* at 1480. When asked what he had done with the gun that he "used to shoot three people" with, Mr. Vinson claimed both that he didn't "know what happened to it," and that he "gave it to somebody." *Id.* at 1485-86.

{¶ 20} Mr. Vinson admitted that he brought a 9mm Glock with a 55 drum magazine to 284 Barthman Avenue. *Id.* at 1488-89. He also admitted that he shot D.M. six times "to stop him from getting out the door" of the house as he was attempting to flee. *Id.* at 1500. Mr. Vinson admitted that he had lied to police when he "volunteered" while being arrested that Brandon Meeks, who he had just killed, had shot Kieara Hobbs at the Exhale Hookah Lounge, and that he tried to pin her murder on Meeks. *Id.* at 1503.

{¶ 21} The jury returned a guilty verdict on every count of the indictment. After merging several of the counts, the trial court sentenced Mr. Vinson to a number of consecutive sentences, resulting in a term of 87 years to life in prison. (Aug. 27, 2019 Amended Jgmt. Entry.)

{¶ 22} Mr. Vinson's appeal asserts the following assignments of error:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MUDER; ATTEMPTED MURDER; FELONIOUS ASSAULT; AND HAVING WEAPONS WHILE UNDER DISABILITY, AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT COMIITED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY ON TRANSFERRED INTENT SELF-DEFENSE.

{¶ 23} In the first assignment of error, Mr. Vinson asserts that the state's evidence was legally insufficient, and the manifest weight of the evidence did not support his convictions. Because "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different," they require two different legal standards. *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Legal sufficiency is a question of law that asks whether the state's evidence passes a "test of adequacy." *Id.* at 386. "The standard when testing the sufficiency of the evidence ' "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, ¶ 15, quoting *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 70, quoting *State v. Jenks*, 61

Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.

{¶ 24} The manifest weight of the evidence standard of review requires the appellate court to consider the state's evidence as an additional, or "thirteenth juror." *Thompkins* at 387. "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387. Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 25} The only argument that Mr. Vinson advances in support of the first assignment of error is that the jury should have believed that "he was defending himself from armed assailants" during both of the shooting incidents that led to his convictions. (Brief of Appellant at 2.) In his "version" of the first shooting, he "fired to defend himself," and killing Kieara Hobbs "was an accident." *Id*. at 2-3. Mr. Vinson's "version" of the second shooting was that three-armed persons were "present" after "an argument over division of the proceeds" from a drug transaction erupted, during which "an unidentified female" pointed a gun at him.[1] *Id*. at 3. His "version of events was consistent," he insists, because he "repeated" it three times: once during an arrest, then during police interviews, and finally, while testifying. *Id*. Thus, it "should have been believed by the trial jury." *Id*.

{¶ 26} Under Rule 16(A)(7) of the Ohio Rules of Appellate Procedure, an appellate brief must present "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Although Mr. Vinson's first assignment of error contends that his

---

[1] In his testimony, Mr. Vinson claimed that Brandon Meeks also threatened him with a gun. During cross-examination, and he identified S.M. as the woman with a gun that he had described during his direct testimony.

convictions were based on legally insufficient evidence, no argument in his brief supports this contention or even mentions legal sufficiency. Because "[t]he appellant bears the burden of affirmatively demonstrating error on appeal," the fleeting mention of a legal doctrine in an assignment of error with no explanation or argument for its applicability amounts to an ineffectual exercise. *State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 11. Like Mr. Vinson, the appellant in *State v. Bruce*, 10th Dist. No. 21AP-376, 2022-Ohio-909, purported to raise both sufficiency and manifest weight challenges in an assignment of error but failed to make any argument explaining the legal insufficiency of the state's evidence. We held that "[b]ecause appellant has not provided this court with a legally supported argument pertaining to the sufficiency of the evidence, that portion of his assignment of error necessarily fails." *Id*. at ¶ 31.

{¶ 27} Even if Mr. Vinson's argument were construed to address legal sufficiency, it would fail for other reasons. The central, yet unstated, premise of Mr. Vinson's contention that he "should have been believed by the trial jury" is that his testimony was more credible than that of the state's witnesses, and the state therefore failed to disprove self-defense. (Brief of Appellant at 3.) But "an evaluation of the witnesses' credibility * * * is not proper on review for evidentiary sufficiency." *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79. Furthermore, as an affirmative defense that relies on evidence introduced by the defendant, self-defense may not be reviewed in a sufficiency-of-the-evidence challenge to the state's evidence. *State v. Gripper*, 10th Dist. No. 12AP-396, 2013-Ohio-2740, ¶ 24 ("A review for sufficiency of the evidence does not apply to affirmative defenses, because this review does not consider the strength of defense evidence."); *State v. Zafar*, 10th Dist. No. 19AP-255, 2020-Ohio-3341, ¶ 42 (applying *Gripper* and reviewing self-defense claim under manifest weight standard instead of legal sufficiency). Thus, Mr. Vinson "cannot challenge the jury's rejection of his claim of self-defense on the ground of sufficiency of the evidence." *Gripper* at ¶ 24. We acknowledge that in 2019, the General Assembly shifted the burden of proving the affirmative defense of self-defense from a defendant to "the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31, citing R.C. 2901.05(B)(1) and 2019 Am.Sub.H.B. No. 228. Notwithstanding this shift, this court continues to hold that "sufficiency of the evidence is not the proper framework to review

whether the state proved the absence of self-defense." *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 44. *See also State v. Angel*, 10th Dist. No. 19AP-771, 2021-Ohio-4322, ¶ 52 (following *Messenger*). Finally, any challenge Mr. Vinson might have formulated to the sufficiency of the state's evidence addressing the elements of the charges would have been futile, given his own admissions when arrested, the eyewitness testimony from the witnesses, the video surveillance footage from the lounge, and the plethora of ballistic and forensic evidence introduced by the state.

{¶ 28} Viewed under the manifest weight of the evidence standard, Mr. Vinson's argument fares no better. His argument—that his "version" of events "should have been believed by the trial jury" because it was "consistent" with his prior assertions that he acted in self-defense—is essentially a plea to consider his testimony more credible than that of the state's witnesses and evidence. (Brief of Appellant at 2-3.) But a "jury is free to believe or disbelieve any or all of a witnesses' testimony." *State v. Hudson*, 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 18, citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257, ¶ 21. Furthermore, " ' where a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding either as being against the manifest weight of the evidence or contrary to law.' " *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26, quoting *In re Miller*, 10th Dist. No. 97AP-853, 1998 Ohio App. LEXIS 246 (Jan. 27, 1998) at *12, quoting *State v. Fluellen*, 10th Dist. No. 74AP-138, 1974 Ohio App. LEXIS 3688 (July 30, 1974) at *7. "In order to justify reversal, the evidence must be such that no reasonable person would believe the testimony which supports the verdict and the judgment." *In re Johnson* at ¶ 26. Here, the jury was free to disbelieve Mr. Vinson's testimony, and to conclude that each time he recounted his "version" of events he mendaciously attempted to shift the blame for his crimes to his victims. Furthermore, Mr. Vinson's protestation of his narrative consistency notwithstanding, the state effectively pointed out a number of contradictions between his previous statements and his testimony, including his own admissions of previous falsehoods, that the jury was well within its rights to hold against him when evaluating his credibility against that of the state's witnesses.

{¶ 29} For the foregoing reasons, the first assignment of error is overruled.

{¶ 30} In the second assignment of error, Mr. Vinson argues that the trial court committed plain error when it "failed to instruct the jury on the concept of transferred intent in the context of a self-defense claim." (Brief of Appellant at 4.) He notes that the jury instruction on transferred intent allowed the state to prove that he murdered Kieara Hobbs because although her death was an "accident," his purposeful intent when shooting at her companion transferred as an element of the crime against her. *Id.* at 5. However, Mr. Vinson argues that the trial court failed to instruct the jury on "the equally applicable concept of self-defense transferred intent," which absolves a defendant of criminal liability for the accidental killing of a third party when he lawfully uses force to protect himself.[2] *Id.* at 5-6. Mr. Vinson concedes that his attorney never requested such an instruction and, as a consequence, harmless error review applies. *Id.* at 7.

{¶ 31} "Generally, an appellate court reviews a trial court's jury instructions for an abuse of discretion." *State v. Daylong*, 10th Dist. No. 19AP-279, 2021-Ohio-4192, ¶ 57, citing *State v. Mankin*, 10th Dist. No. 19AP-650, 2020-Ohio-5317, ¶ 33. However, "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). An appellant who fails to object as required by Crim.R. 30(A) "is precluded from claiming error in the instructions to the jury unless the instructions constitute plain error under Crim.R. 52(B)." *State v. McCown*, 10th Dist. No. 06AP-153, 2006-Ohio-6040, ¶ 36.

{¶ 32} Crim.R. 52(B) allows that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Second, to be considered plain, the error asserted "must be an 'obvious' defect in the trial proceedings." *Id.*, citing *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001). Third, the error in question "must have affected substantial rights" by "affect[ing] the outcome of the trial." *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, ¶ 33, quoting *Barnes*, 94 Ohio St. at 27. In

---

[2] Mr. Vinson does not include his convictions for felonious assault and attempted murder against the victim L.D. in this assignment of error, although the argument would presumably apply to it as well. Mr. Vinson shot L.D. and Kieara Hobbs, but only asserted his self-defense argument as a response to threats from C.B.

other words, "the accused is 'required to demonstrate a reasonable *probability* that the error resulted in prejudice' " to show plain error. *Id.*, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

{¶ 33} "Even if a forfeited error satisfies these three prongs, however, Crim.R. 52(B) does not demand that an appellate court correct it" because the rule "states only that a reviewing court 'may' notice plain forfeited errors; a court is not obliged to correct them." *Barnes*, 94 Ohio St.3d at 27. Thus, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 34} Mr. Vinson asserts that the trial court's failure to provide a jury instruction on transferred intent self-defense meets the plain error standard. "The rule regarding jury instructions is that requested instructions in a criminal case must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). In addition, a jury instruction must be "appropriate to the facts." *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46, citing *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, ¶ 5, and *State v. Lessin*, 67 Ohio St.3d 487, 493 (1993). The trial court "must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *White* at ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

{¶ 35} Mr. Vinson does not provide a specific example of the jury instruction on transferred intent self-defense that he believes the trial court should have provided. He cites to *State v. Clifton*, 32 Ohio App.2d 284 (1st Dist.1972), in which the First District Court of Appeals reversed a defendant's manslaughter conviction after concluding that the trial court should have instructed the jury that "[t]he accidental killing of an innocent party by one acting in self-defense against an attack by another is not a crime * * *." *Id.* at syllabus. In *Clifton*, the defendant was working in a shop when he and a teenage customer had an "altercation" that prompted the teenager to go home and complain to his older brother, who then returned "in the company of another brother and a friend, one James Hargrove (the deceased)" to confront the defendant. *Id.* at 284. After another confrontation, the group left the store, but "thereafter, the elder brother re-entered," and "while the defendant had

his back turned, the elder brother struck him on the shoulder with a belt, the buckle of which left a discernible mark upon the flesh." *Id.* at 285. The defendant reacted by turning around the gun and firing, killing the victim Hargrove as the group fled. *Id.*

{¶ 36} The First District reasoned that the doctrine of transferred intent applied to the defendant's self-defense claim:

> Clearly, one who kills in self-defense does so without the *mens rea* that otherwise would render him culpable of the homicide. Therefore, if the act of taking the life of an assailant is not criminal does it become so when a stray shot kills a bystander?
>
> It has been long accepted that if A shoots at B, intending to kill B, but instead the bullet strikes C, then A has committed a criminal act as to C. In such instance, the "malice follows the blow" and the criminal intent of A to harm B is transferred to C.
>
> However, if A had no criminal intent with respect to B, as where A is exercising a lawful right of self-defense, none could exist as to C. It follows, then, that A in shooting C has not committed a criminal act, the essential of a *mens rea* being impossible of proof. The inquiry must be whether the killing would have been justifiable if the accused had killed the person whom he intended to kill, as the unintended act derives its character from the intended.
>
> * * *
>
> The jury was fully and correctly instructed as to the law pertaining to the asserted right to self-defense. However, the court erred in refusing to include an instruction that if the jury found that the accused was acting in self-defense when he fired the shot that killed James Hargrove, he would be entitled to acquittal even though Hargrove was not the assailant.
>
> It is conceivable that from all the evidence and in obeying the instructions of the court the jury believed that defendant did prove self-defense as to the elder brother, but because of the void in the charge could not find the homicide of James Hargrove to be justifiable.

*Id.* at 286-87.

{¶ 37} The *Clifton* court was concerned that the "void in the charge" it identified might have hampered the jury's ability to properly weigh the evidence and perform its fact-finding duty. The trial court's refusal to include a jury instruction stating that "[t]he accidental killing of an innocent party by one acting in self-defense against an attack by

another is not a crime" might have allowed the jury to conclude that the defendant's right to self-defense did not encompass the actual victim. *Id.* at 284, 287.

{¶ 38} A similar concern arises when reviewing the jury instructions provided to Mr. Vinson's jury. The instructions on self-defense were legally correct and properly instructed the jury on the burden of the state to disprove "beyond a reasonable doubt that the defendant did not properly act in self-defense." (July 24, 2019 Jury Instructions at 10.) They also included the following statement: "You must consider the conduct of the person against whom the defendant used deadly force and determine if that person's acts and words caused the defendant to reasonably and honestly believe that the defendant was about to be killed or to receive great bodily harm." *Id.* at 11. While legally correct and applicable in almost any self-defense scenario, in the unusual circumstance in which the aggressor is not the ultimate victim, this statement could have the unintended consequence described in *Clifton*. Requiring the jury to consider "the conduct of the person against whom the defendant used deadly force" and "that person's acts and words" could lead a jury to conclude that self-defense cannot apply to the accidental killing of an unintended victim, only the actual aggressor.

{¶ 39} This concern motivated the dissent in *State v. Robinson*, 132 Ohio App.3d 830, 836 (1st Dist.1999), in which the majority held that the defendant, a drug dealer who accidently shot a companion through a locked bedroom door as armed drug runners invaded the house, was not entitled to a self-defense instruction at all because he "was at fault in creating the situation that led to the affray." *Id.* at syllabus. The dissent disagreed and believed that the defendant was also entitled to a transferred intent self-defense instruction under *Clifton*:

> The transferred-intent self-defense instruction was necessary for the jury to evaluate [the defendant]'s claim of self-defense as it applied to [the victim]. Without it, the jury was cast at sea with half a compass. Without the requested instruction, the jury easily could have believed that [the defendant]'s intent to kill the robbers could be transferred to prove the intent to kill [the victim], but that he was entitled to defend himself only against the robbers.

*Id.* at 846 (Painter, J., dissenting).

{¶ 40} Unlike the First District in *Clifton* and *Robinson*, this court has never expressly applied the doctrine of transferred intent self-defense. We will therefore

"assume, without deciding, that the doctrine of transferred intent of self-defense applies and that the trial court erred with it failed to give the self-defense instruction as it relates to victim" Kieara Hobbs. State v. Howard, 4th Dist. No. 07CA2948, 2007-Ohio-6331, ¶ 33. Although a jury instruction on transferred intent self-defense would have filled the "void in the charge" *Clifton* describes, we nevertheless conclude that the trial court's failure to include one here did not affect Mr. Vinson's substantial rights or the outcome of the trial. In his testimony, Mr. Vinson identified C.B., the victim's companion at the Exhale Hookah Lounge, as the alleged aggressor that made him feel it was necessary to "defend [his] life." (Tr. Vol. 7 at 1452.) Yet the jury convicted Mr. Vinson of the charge of attempted murder against C.B. This demonstrates that the state successfully disproved self-defense beyond a reasonable doubt in the charge where the doctrine of transferred intent was irrelevant to prove an element of the offense itself or to prove self-defense. It was self-defense against C.B. that Mr. Vinson claimed justified his purportedly accidental shooting of Kieara Hobbs. Because the jury did not accept this justification with regards to shooting C.B., it would not have "transferred" any asserted justification to the murder charge against Kieara Hobbs. *See Howard* at ¶ 34 (holding that trial court's refusal to give jury instruction on transferred intent self-defense on charge against second victim was harmless and did not prejudice the defendant because "[t]he jury, to reach its verdict, had to find that [the defendant] did not act in self-defense as it relates to [aggressor] victim"). Because any error that resulted from the omission of an instruction on transferred intent self-defense was harmless, the second assignment of error is overruled.

{¶ 41} Having overruled Mr. Vinson's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, J., concurs.
SADLER, J., concurring in part and concurring in judgment.


SADLER, J., concurring in part and concurring in judgment.

{¶ 42} I agree that both of appellant's assignments of error should be overruled and that the judgment of the trial court should be affirmed. In resolving appellant's second assignment of error, I also agree with the majority's conclusion that appellant has not demonstrated plain error resulting from the omission of an instruction on transferred

intent self-defense. Accordingly, in my view, we need not address *Clifton* or *Robinson* nor must we reach the issue of whether the doctrine of transferred intent self-defense is expressly applicable here. *See State v. Webster*, 10th Dist. No 20AP-171, 2021-Ohio-3218, ¶ 33 ("Here, we need not determine whether the trial court's instruction on aiding and abetting was a plain error under the first and second prongs of the plain error test, because even if it was, Webster is unable to satisfy the third prong of the plain error test."); *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 80-81 (court need not decide whether importuning required in-person solicitation because, under the facts of the case, there was evidence that appellant solicited the victim over the phone and in-person); *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 134 (court need not reach state's argument that trial court erred by instructing jury during penalty phase that defendant bore no burden of proof "because, even assuming for purposes of argument that [the 'no burden' instruction] was [erroneous], there is no demonstration of the requisite prejudice in order for us to find reversible error").

{¶ 43} Therefore, I respectfully concur in part and concur in the judgment affirming trial court.

_____