[Cite as *State v. Erb*, 2022-Ohio-3797.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 21AP-402 |
| | | (C.P.C. No. 20CR-4765) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Kaitlyn M. Erb, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on October 25, 2022

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Wilson* for appellee.

**On brief:** *Jeremy A. Roth*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Kaitlyn M. Erb, appeals from a judgment entry of the Franklin County Court of Common Pleas finding her guilty, pursuant to a jury verdict, of one count of felonious assault.

{¶ 2} For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} By indictment filed October 8, 2020, plaintiff-appellee, State of Ohio, charged appellant with one count of felonious assault in violation of R.C. 2903.11, a felony of the second degree. The charge related to an incident on or about August 10, 2020. On October 13, 2020, appellant entered a plea of not guilty. The trial began on June 14, 2021. The following evidence was adduced at trial.

{¶ 4}  Krystal Mori testified that she has been an officer with the Columbus Police Department for the last two years.  According to Mori, on August 10, 2020, she responded to a call for service concerning a stabbing at Ashburton Road.  (Tr. Vol. I at 172-73.)  Mori testified that she arrived at the scene and observed a female victim—later identified as C.C.—"holding her hand, and they had her hand wrapped in a cloth." (Tr. at 173.)  Mori did not observe a suspect but saw a baseball bat left at the scene.  (Tr. at 175.)  Mori testified to securing the area while the detectives collected information.  On cross-examination, Mori testified that she works a shift between 2:00-10:00 p.m.  The location of the scene was a parking lot adjacent to an apartment building.

{¶ 5}  Collins Kane testified that he is a sergeant and second shift supervisor of the Crime Scene Search Unit with the Columbus Police Department.  Kane described the Crime Scene Search Unit as "detectives who are called to certain scenes by detectives.  They call. We get there. They usually ask for photographs of the scene.  If there's evidence to be collected, we collect the evidence and turn it in. Sometimes, on more complicated scenes, we'll do sketches, swab for DNA, blood, things like that."  (Tr. Vol. II at 189-90.)  Kane testified that he responded to a call at Ashburton Road on August 10, 2020.  According to Kane, when he arrived "[t]here was one car, and then there was a blood trail."  (Tr. at 191.)  Kane stated that he received the call at the crime scene office at 6:40 p.m. and started taking pictures at 7:07 p.m.  (Tr.at 192.)  Kane testified regarding photographs of areas where blood was discovered as well as images of a baseball bat.  (Tr. at 198.)  Kane stated that he also collected physical evidence recovered at the scene.  (Tr. at 199.)

{¶ 6}  David Younker testified that he is a detective with the Columbus Police Department in the Felony Assault Unit. Younker stated that his duties are to "investigate all felony assaults, usually shootings, stabbings, where they, obviously, survive their wounds, broken bones, major cases like that."  (Tr. at 204.)  Younker testified to responding to the scene at Ashburton Road.  (Tr. at 205.)  Younker stated that he then went to Grant Hospital and took photographs of the victim's injuries.  According to Younker, he was unable to speak with C.C. as she was sedated for her injuries.  Younker observed that the victim had a large laceration on one of her hands from a sharp object.  (Tr. at 206.)  Younker also testified C.C. had some knots and marks on the back of her head.  Younker identified several photographs of the victim's injuries.  According to Younker, after taking the

photographs at issue, he uploaded the images into the case file. (Tr. at 209.) Younker acknowledged on cross-examination that he was not present during the incident and did not know what happened to the victim's hand. (Tr. at 210-11.)

{¶ 7} Mautez Fulton testified that he is a detective in the Columbus Police Department. (Tr. at 212.) Fulton has been a police officer for approximately 18 years and a detective since 2018. Fulton was assigned to investigate the alleged assault at Ashburton Road. (Tr. at 214-15.) Fulton testified that Mary Ann Holbert was identified as someone associated with the suspect in the case. (Tr. at 216.) Fulton stated that they searched Holbert's name in the law enforcement database, LEADS, which provided her home address. Fulton went over to Holbert's home and conducted an interview. (Tr. at 218.) According to Fulton, Holbert stated the name of the suspect was Kaitlyn, later identified as the appellant. Fulton also learned that appellant was romantically involved[1] with a man named Michael Hood that was also present during the incident. According to Fulton, Holbert showed him their Facebook pages, which indicated that appellant and Hood lived in Oklahoma. (Tr. at 220.)

{¶ 8} Fulton testified that he conducted a telephone interview with the victim, C.C., the day after the incident. (Tr. at 223.) Fulton described creating a photo array, which included an image of appellant, for review. According to Fulton, since he created the photo array, he was not present for the photo identification. Fulton stated that the photo array was administered a few days after the incident. Fulton testified that he was later informed that appellant was identified as the assailant. Fulton filed an arrest warrant and notified law enforcement in Oklahoma. (Tr. at 225.) Appellant was then arrested in Oklahoma and extradited back to Ohio. *Id.*

{¶ 9} Fulton also provided testimony regarding his interview of appellant. Fulton stated he provided appellant a *Miranda* warning and had her sign a written waiver form before conducting the interview. (Tr. at 227.) Fulton stated that appellant did not appear intoxicated or under the influence of drugs or alcohol. (Tr. at 227.) According to Fulton, appellant admitted during the interview to hitting the victim with a hatchet. (Tr. at 235.) At the conclusion of the interview, appellant was transported to the Franklin County jail.

---

[1] While ultimately irrelevant to the resolution of the case, we note that the record conflicts as to whether Michael Hood is the boyfriend or husband of appellant.

{¶ 10} On cross-examination, Fulton stated he filed the arrest warrant on August 18, 2020. (Tr. at 240.) Fulton interviewed appellant on September 30, 2020. (Tr. at 242.) Fulton acknowledged that he told appellant there was a video of the incident when, in reality, there was no such video. (Tr. at 245.) Fulton explained this is an investigative technique for the suspect to give valid information. On re-direct examination, Fulton testified that the 5 to 15 people at the scene were not helpful or willing to give their names to law enforcement. Fulton testified that appellant agreed to the interview before he mentioned anything about a video. (Tr. at 249.)

{¶ 11} James Jude testified that he is a detective with the Columbus Police Department in the Felony Assault Unit. (Tr. at 251.) Jude testified to administering the photo array to the victim on August 17, 2020. (Tr. at 254.) According to Jude, the photo array included six pictures, and he did not know who the suspect was when he administered the identification. (Tr. at 256.) Jude explained, "I know little to nothing about the case. It's done that way on purpose so I don't know who the individual in the photo array is so I can show it while keeping the integrity of the photo array because I don't know who we're looking for. I don't know who the person is in the photo array that we're showing." (Tr. at 253.) Jude testified that he read the directions to the victim and asked if she understood the instructions. Both C.C. and Jude signed the form acknowledging the instruction. (Tr. at 254-55.) According to Jude, C.C. selected the picture of the appellant, image No. 4, as the individual involved in the alleged assault.

{¶ 12} C.C. testified that she has lived in Columbus her entire life and is currently employed at a "security job." (Tr. at 262.) Prior to the incident, she was employed as a home health aide for the last ten years. (Tr. at 263.) According to C.C., she was living on Ashburton Road with her children on August 10, 2020. On the day of the incident, she was at the back of a neighbor's house with five or six other people, which included the father of Holbert's child, Gregory Clark. (Tr. at 264-65.) Appellant and Holbert entered the residence where the group was congregating. Holbert also had a child with her at the time.[2] C.C. characterized Holbert's behavior as disrespectful towards everyone in the apartment. According to C.C., an argument ensued, and the guests exited the residence. (Tr. at 266-67.) Holbert, Clark, the child, and appellant all proceeded to get back into appellant's

---

[2] According to C.C., Holbert was carrying her child when she entered the residence.

vehicle in the parking lot. (Tr. at 269, 271.) C.C. testified that several people had gathered outside in the parking lot near the vehicle. C.C. identified the other people standing by the car as "Simmy" and "Deaf Cuz." (Tr. at 270.) According to C.C., Holbert was on the phone and began to call everyone outside the vehicle the "B word." (Tr. at 271.) C.C. responded to Holbert stating, "Baby girl, we don't know you. You don't know us. So why you got to keep calling us B words?" (Tr. at 272.)

{¶ 13} C.C. testified that she then exchanged words with the driver, later identified as the appellant, at which point appellant revved her engine like she was going to hit C.C. with the vehicle. (Tr. at 272-73.) C.C. told appellant, "I wish you would hit me with that car." (Tr. at 274.) C.C. recounted that Clark then exited the vehicle with the baby and started "having words" with Holbert. According to C.C., appellant then walked over to Clark and Holbert with a baseball bat. C.C. testified that she started laughing at the situation when appellant exited the vehicle. (Tr. at 275.) Appellant then walked towards C.C. and tried to push her down. When C.C. was about to fight back, appellant started swinging something she believed at the time was a baseball bat. C.C. raised her hand to protect herself then noticed that she was bleeding from her hand. "My hand's been chopped open." (Tr. at 282.) C.C. recalled appellant saying, "get that hatchet." (Tr. at 283.) C.C. stated that appellant then got into the car and left the area. C.C. testified that she did not see the hatchet anywhere after appellant left the parking lot.

{¶ 14} C.C. used several towels to contain the blood until the ambulance arrived. (Tr. at 284.) C.C. was transported to Grant Hospital where she stayed for three or four days. (Tr. at 286.) C.C. had surgery on her hand several weeks later. (Tr. at 286.) C.C. testified to scarring and only having about 40 percent function in her hand. The jury was permitted to do a jury view of C.C.'s hand in the courtroom. (Tr. at 287.) C.C. engaged in physical therapy for six months but stopped due to a lack of progress. C.C. lost her job because of the loss of use of her hand. C.C. identified appellant in the courtroom as the individual that attacked her on August 10, 2020. (Tr. at 290-91.) C.C. testified that the whole incident took around 20 minutes, which included 7-8 minutes where appellant was outside her vehicle. (Tr. at 291.)

{¶ 15} On cross-examination, C.C. acknowledged that she was smoking marijuana prior to the incident. (Tr. at 294.) C.C. conceded that she told the investigator that she left

the apartment because "I know my mouth." (Tr. at 295.) C.C. stated she was not angry when she spoke to Holbert. (Tr. at 299.) C.C. testified that prior to the assault, she acknowledged she laughed at Holbert. "It was funny. It wasn't a devious laugh. It was a funny laugh." (Tr. at 303.) While C.C. told the investigator that appellant had a bat and hatchet during the attack, she did not know about the hatchet at the time. "So, yes, I am talking as if I know -- I knew that she had it. But in the beginning, I never knew she had a hatchet in her hand. She had a metal bat." (Tr. at 308.) C.C. testified she also heard there was a fight between Holbert's husband and Deaf Cuz. (Tr. at 307.)

{¶ 16} On re-direct examination, C.C. stated that it was a chaotic situation. "I'm focused on keeping myself calm so I don't bleed out." (Tr. at 311.) C.C. testified that, in addition to her hand injury, she had ten staples in her head plus stiches. (Tr. at 312.) C.C. testified her head injury affects her short-term memory and impacts her balance. "I fell. I fell in front of my kids." (Tr. at 312.) C.C. testified that during the administration of the photo array, Fulton stepped aside, and it was just her and the other detective in the room. (Tr. at 312.) C.C. stated that she initially left the residence because she did not want "[n]othing to happen." (Tr. at 313.)

{¶ 17} At the conclusion of C.C.'s testimony, the state rested its case and moved to admit its exhibits. Counsel for appellant noted no objection to the admission of the exhibits, and they were admitted into the record. Counsel for appellant then moved for judgment of acquittal, pursuant to Crim.R. 29, contending that the state failed to meet its burden as to the elements of felonious assault. (Tr. at 317.) The trial court denied the motion finding the state had provided sufficient evidence for the matter to go to the jury for deliberation.

{¶ 18} Appellant testified that she is 25 years old and was recently employed in Oklahoma. (Tr. at 320.) Appellant stated she was cooperative when she was arrested and did not give a false name. (Tr. at 320.) Appellant testified that she has been involved with Michael Hood for four years. According to appellant, she came to Columbus with Hood to meet his biological sister, Holbert. Appellant testified that Hood and Holbert were adopted to different homes when they were born and wanted to meet in person for the first time. (Tr. at 322.) Appellant testified to going with Holbert to the Ashburton residence to meet Clark.

{¶ 19} Appellant testified that when they arrived at the Ashburton apartments, C.C. was sitting in a chair outside. (Tr. at 326.) According to appellant, Clark goes around the back side of the car with the baby and begins to swing at Holbert. Appellant then grabbed the bat to "tell him to back off. I was, like, we're not doing this bullshit." (Tr. at 329.) Appellant then gets back into the vehicle. According to appellant, another man, known as "Moo Moo," drove his vehicle behind her car preventing her from backing out of the parking lot. Holbert and C.C. started to argue "then Gregory comes around the car. And when he comes around the car, they both go towards her; and that's when I hopped out with the hatchet and the bat." (Tr. at 330.) According to appellant, Deaf Cuz came around and punched Hood in the jaw. (Tr. at 331.) Appellant stated that at this point she has a bat in one hand and a hatchet in the other and "was more like I was trying to tell them, like, we're not doing this. Like I was trying to scare tactic them, I guess you could say." (Tr. at 331.) According to appellant, C.C. then hit the bat out of her hand and laughed in her face. Appellant characterized C.C.'s behavior as intimidating and trying to provoke her "to do something to her." (Tr. at 332-33.) Appellant stated that she pushed C.C. but denied that C.C. fell to the ground. (Tr. at 333.) Appellant testified that C.C. then swung and hit her in the chest. "And when she hit me in the chest, I retaliated by hitting her back. * * * [m]ind you, the hatchet is in my hand. I'm not saying that it was not." (Tr. at 334.) Appellant testified that they were engaged in a fist fight at that point. (Tr. at 334.) Appellant then got into her vehicle and told Moo Moo that the car needed to be moved stating "Either move your car or * * * I'm going to plow through the bitch." (Tr. at 335.) Appellant stated Hood, Holbert, and the baby all left with her after the incident. (Tr. at 338.) According to appellant, they went back to Holbert's house, packed, and went to a hotel. Appellant returned to Oklahoma the next day. (Tr. at 339-40.)

{¶ 20} Appellant stated she did not go over to the house to start a fight and did not intend to hurt C.C. (Tr. at 341.) "I was just trying to make everything stop." (Tr. at 341.) Appellant believed the whole incident took around 30-45 minutes. (Tr. at 342.) According to appellant, C.C. called her a "big bitch and a fat bitch." (Tr. at 342.) Appellant testified she could not initially leave the altercation because her vehicle was blocked in by Moo Moo. (Tr. at 343.) Appellant denied that she moved her vehicle at any point to try and hit C.C. (Tr. at 344.)

{¶ 21} On cross-examination, appellant conceded she did not tell law enforcement she was blocked in by Moo Moo's vehicle. (Tr. at 347.) Appellant acknowledged she hit C.C. with a hatchet. (Tr. at 348.) Appellant stated that she keeps camping gear, including the hatchet, in her vehicle. Appellant kept the baseball bat in her car because she went to work at 5:30 a.m., and "the neighborhood * * * is not very good." (Tr. at 350.) Appellant acknowledged C.C. did not have a weapon. (Tr. at 354.)

{¶ 22} Counsel for appellant rested at the conclusion of appellant's testimony. Counsel for appellant also renewed his Crim.R. 29 motion, which was denied. Relevant to the instant appeal, appellant requested a jury instruction for aggravated assault as an inferior offense of felonious assault, which the trial court granted.

{¶ 23} Following deliberations, the jury found appellant guilty of felonious assault. The trial court conducted a sentencing hearing on July 16, 2021. At the conclusion of the hearing, appellant was sentenced to 4-6 years in prison with a 3-year period of post-release control. Appellant was given 333 days of jail time credit.

{¶ 24} Appellant filed a timely appeal.

## II. ASSIGNMENT OF ERROR

{¶ 25} Appellant assigns the following as trial court error:

> 1. THE JUDGMENT OF GUILTY ON THE OFFENSE OF FELONIOUS ASSAULT ENTERED BY THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. LEGAL ANALYSIS

{¶ 26} In appellant's sole assignment of error, she argues that her conviction was against the manifest weight of the evidence. Appellant contends that the evidence at trial demonstrated that the proper conviction should have been aggravated assault instead of felonious assault.

{¶ 27} When considering a manifest weight argument, a reviewing court evaluates the state's evidence as an additional, or "thirteenth juror." *State v. Vinson*, 10th Dist. No. 19AP-574, 2022-Ohio-2031, ¶ 24, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the

jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387.

{¶ 28} The trier of fact primarily makes determinations of credibility and weight of the testimony. *State v. Craig*, 10th Dist. No. 21AP-468, 2022-Ohio-1219, ¶ 18, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Therefore, the jury may consider and resolve any inconsistences in testimony by " 'believ[ing] all, part, or none of a witness's testimony.' " *Craig* at ¶ 18, quoting *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Only the most " 'exceptional cases in which the evidence weighs heavily against the conviction' " warrant reversal on manifest weight grounds. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215 (1st Dist.1983).

{¶ 29} Appellant argues that because "there was a serious provocation * * * Appellant's conviction should have been for the inferior offense of Aggravated Assault and not Felonious Assault." (Appellant's Brief at 18.) As set forth in R.C. 2903.11, felonious assault is defined as knowingly causing serious physical harm to another or cause, or attempt to cause, physical harm to another by means of a deadly weapon. Conversely, the offense of aggravated assault is defined as, "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon." R.C. 2903.12(A)(2).[3] Appellant posits there were numerous factors that contributed to the extreme stress that led to appellant's use of deadly force writing, "she had been in an extremely hostile environment for over 30 minutes, was unable to leave with her vehicle, had been called awful names by individuals who admittedly had been using drugs which triggered her, and was dealing with a scenario which involved danger of physical injury to a 7-month-old child." (Appellant's Brief at 19.)

---

[3] "Serious provocation under R.C. 2903.12 means provocation 'reasonably sufficient to bring on extreme stress and * * * reasonably sufficient to incite or to arouse the defendant into using deadly force.' " (Remaining citations omitted.) *State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 37, quoting *State v. Saur*, 10th Dist. No. 10AP-1195, 2013-Ohio-1674, ¶ 31.

{¶ 30} Based on our review of the entire record, we do not agree that the jury clearly lost its way in this case warranting reversal on manifest weight grounds. First, for an action to be considered "serious provocation" under R.C. 2903.12, it must be "occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.12(A). We find most of the causes justifying appellant's "sudden passion" do not concern the victim in this case. C.C. had nothing to do with the length of the visit at the Ashburton residence as well as why appellant's vehicle[4] was blocked from leaving the apartment parking lot. Moreover, C.C. was not involved in the other altercation with Hood or meaningfully involved in any potential danger to the child.

{¶ 31} Appellant's argument focuses on statements made by C.C. to appellant that were purportedly of a taunting nature. However, the Supreme Court of Ohio, has held " 'words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations.' " *State v. Shane*, 63 Ohio St.3d 630, 637 (1992); *see also State v. Ellis,* 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 8 ("the use of a deadly weapon is not permitted because of words. Vile or abusive language or verbal threats, no matter how provocative, do not justify an assault or the use of a deadly weapon.").

{¶ 32} It is clear from the record that appellant initiated the physical altercation with C.C. by pushing her into the vehicle. (Tr. at 280, 332-33.) As noted by the state in its brief, "When [C.C.] responded by, depending on who you believe - either making a fist and coming up to defend herself, or striking [appellant] in the chest, [appellant] reacted by striking the victim with a deadly weapon, i.e. the hatchet." (Appellee's Brief at 20.) Here, the jury was presented with both accounts of the events on August 10, 2020. The jury chose to reject appellant's argument that C.C. seriously provoked appellant inciting the use of deadly force. Instead, the jury believed the state's version of events finding appellant knowingly caused, or attempted to cause, physical harm to another by means of a deadly weapon. It is well-established law that a conviction is not against the manifest weight of the evidence if the trier of fact believes the state's account of the events over the defendant's version of events. *Dublin v. Starr*, 10th Dist. No. 21AP-173, 2022-Ohio-2298, ¶ 40, citing *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 49, citing *State v. Lindsey,*

---

[4] The state disputed this point noting in its cross-examination of appellant that she failed to mention to law enforcement that her vehicle was blocked in during the altercation. (Tr. at 346.)

10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43.  A " 'jury is free to believe or disbelieve any or all of a witnesses' testimony.' "  *Vinson* at ¶ 28, quoting *State v. Hudson*, 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 18, citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio- 1257, ¶ 21.  "In order to justify reversal, the evidence must be such that no reasonable person would believe the testimony which supports the verdict and the judgment." *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26.  Therefore, in light of the evidence discussed above, as well as our review of the record in its entirety, we find the manifest weight of the evidence supports appellant's conviction of felonious assault.

{¶ 33} For the foregoing reasons, appellant's sole assignment of error is overruled.

## IV.  CONCLUSION

{¶ 34} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, P.J. and SADLER, J., concur.

_____