[Cite as *State v. Huish*, 2023-Ohio-365.]

IN THE COURT OF APPEALS OF OHIO

TENNTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 21AP-255<br>(C.P.C. No. 19CR-4125) |
| Gregory Huish, | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on February 8, 2023

**On brief:** *April F. Campbell,* Campbell Law, LLC, for appellant.[1]

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** Seth L. Gilbert.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Gregory Huish, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, pursuant to a jury verdict, finding him guilty of two counts of murder and one count of tampering with evidence.

{¶ 2} For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} On August 21, 2019, appellant was indicted on two counts of murder in violation of R.C. 2903.02, unclassified felonies (Counts One and Two); and one count of

---

[1] On February 17, 2022, counsel for appellant filed a notice of waiver of oral argument and submitted this case for a decision on the briefs.

tampering with evidence in violation of R.C. 2921.12, a felony of the third degree (Count Three). Appellant entered a not-guilty plea on August 23, 2019. A jury trial commenced on March 26, 2021. The following evidence was adduced at trial.

{¶ 4}   In the summer of 2019, Daniel James Atchley resided at 380 Stoddart Avenue in the Old Town East neighborhood of Columbus, Ohio. (Tr. Vol. II at 40, 42.) Atchley testified that during this time, appellant was his neighbor and lived in the nearby property at 382 Stoddart Avenue. (Tr. at 42-43.) Atchley identified appellant in the courtroom. (Tr. at 43-44.) Appellant had initially lived in the building with a female roommate that had small dogs and another male roommate. A fourth roommate, Ce'Marlo Fletcher, later moved into the residence. (Tr. at 43.) Atchley stated his relationship with Fletcher consisted mainly of waving and saying hello. (Tr. at 45-46.) Atchley testified that his house was about 10 to 20 feet from the 382 Stoddart Avenue property. (Tr. at 46-47.)

{¶ 5}   On August 12, 2019, Atchley returned from work around 5:00 p.m. At approximately 9:30 p.m., Atchley was reading a book on his porch when he "started hearing events going on next door, I heard raised voices." (Tr. at 50.) Atchley testified that he heard two male voices yelling at each other for approximately 15-20 minutes. (Tr. at 51.) "The only phrase that I could make out was, '$400.' " (Tr. at 51.) According to Atchley, Fletcher then came outside on his cell phone. Before returning inside, Atchley overheard Fletcher state that his PlayStation 4 had been stolen. (Tr. at 52.) Huish then came outside and told Atchley that Fletcher believed Huish stole his PlayStation 4. Huish denied having anything to do with it. (Tr. at 53.) After approximately five minutes, Fletcher came outside demanding his rent. "I distinctly remember [Fletcher] saying that he wanted his rent money back for the month of August, he said he wanted his rent money back and he was moving out." (Tr. at 54.) Before Huish went back inside his residence, Atchley cautioned Huish to be careful. (Tr. at 54.) Atchley testified Huish went inside at approximately 10:00 p.m. (Tr. at 56.) Later in the evening, Atchley heard someone yell "help me" as they were running up the alleyway. (Tr. at 56.) Atchley then told his roommate to call 911. According to Atchley, he saw a "pool of blood on my front porch * * * and I saw Ce'Marlo out moving toward the street, and he stumbled and was falling in the tree lawn * * * near a parked car and out in our front lawn." (Tr. at 59.) Atchley turned "Ce'Marlo on to his back and I knew that there was blood on my porch and could see that he was bleeding." (Tr. at 59.) Atchley observed a

large wound on the top of his stomach and attempted first aid by putting pressure on the wound. (Tr. at 60-61.) According to Atchley, the only thing Fletcher would say was "PS4." (Tr. at 60.) Law enforcement soon arrived and secured the area. The paramedics then took over first aid. (Tr. at 62.)

{¶ 6} On cross-examination, Atchley testified that when he spoke to Huish, he did not seem angry but more off-guard at being accused of stealing the PlayStation 4. (Tr. at 71.) Atchley stated, after speaking with Huish and hearing the yelling, he was worried that there would be a fight. (Tr. at 73.) Atchley acknowledged that he did not see the incident and did not know what happened inside the residence. (Tr. at 73.)

{¶ 7} Officer Amanda Hill testified that she has been a patrol officer for the Columbus Division of Police for nearly ten years. (Tr. at 81-82.) On August 12, 2019, Hill responded to a call around 10:30 p.m. that was believed to be a shooting at Stoddart Avenue. (Tr. at 84.) Hill and her partner arrived at the scene and identified the victim laying on the ground. (Tr. at 84.) Hill attempted first aid, but the victim was unresponsive. (Tr. at 86.) Hill testified that the victim had injuries "[t]o his torso, initially we believed it would be gunshots, but, I -- I couldn't tell you exactly where they were in his torso." (Tr. at 87.) After the medics arrived, Hill went to the victim's residence and saw blood along the door frame. (Tr. at 88.) Hill testified that she went inside the home and observed more blood that was "[b]asically everywhere. Walking in was like a front room and then towards the back, just the whole way through, you saw blood." (Tr. at 88-89.) Hill then assisted in securing the scene. (Tr. at 89.) On cross-examination, Hill testified that she attempted to speak with the victim, but he was unresponsive. (Tr. at 95-96.)

{¶ 8} Officer Carl Harmon testified that he has been employed by the Columbus Division of Police as a police officer for seven years. (Tr. at 99-100.) On August 12, 2019, Harmon was dispatched to Stoddart Avenue for what was believed at that time to be a shooting. (Tr. at 104.) Harmon testified that he arrived at the scene where other officers were rendering aid to the victim. (Tr. at 108.) Harmon and Officer Sean Mottinger entered the residence believing there was an armed suspect. (Tr. at 109-10.) Harmon described the residence as a duplex, and he testified that they proceeded to search the left side of the building. (Tr. at 110.) According to Harmon, the officers followed a trail of blood leading up the stairs. (Tr. at 110.) Harmon cleared the house but did not find anyone inside. (Tr. at 110-

11.) Harmon characterized the scene as "very, very apparent that something, a crime of violence had occurred inside the living room." (Tr. at 112.) According to Harmon, they went upstairs and found the door to the attic was locked. (Tr. at 112.) Harmon stated that they ultimately took the door apart to conduct a search of the attic. (Tr. at 112-13.) Harmon stated the attic was accessible to the other unit so he wanted to search the other side of the building. According to Harmon, it took approximately 10-15 minutes to clear the first side of the duplex. (Tr. at 115.) Harmon then went to the other side of the double unit and continued the search. (Tr. at 113-14.) Harmon stated that he announced himself during the search. "I want everybody to know that the police are here." (Tr. at 117.) Harmon testified regarding the search of the other half of the house as follows:

> The search was pretty quick because, like I said, it was vacant, there's not a lot that we have to search through. I made my way to the attic. The way that the attic was situated, it was a mirror of the other place, and so I knew that the closet, if you will, doors were lower, about waste height. So when I get to the attic I turned right and I could tell there was one of those closet doors and I moved back the piece of wood that was, I guess, acting as the door, and I saw the suspect or who I thought to be the suspect at the time hiding in there.

(Tr. at 116.)

{¶ 9} According to Harmon, he then ordered the suspect out of the closet. (Tr. at 118.) Harmon observed that the suspect had blood on his shirt. Harmon did not notice any injuries on appellant at that time. (Tr. at 120-21.) Harmon testified that he ordered the suspect out, to turn around, and put his hands up. (Tr. at 119.) Harmon told the suspect that if he moved "I'll fucking kill you," which the suspect replied, "[g]o ahead and do it." (Tr. at 120.) According to Harmon, the suspect then turned towards him, which forced him to tackle the suspect into a mini fridge. (Tr. at 121.) Harmon brought the suspect to the ground and placed him in handcuffs. (Tr. at 122.) Harmon asked the suspect "why did you do that" in reference to advancing on him during the arrest. (Tr. at 122.) Huish stated, " '[i]t was an accident' or '[h]e attacked me.' " (Tr. at 123.) Harmon identified Huish in the courtroom as the suspect he placed under arrest at the scene. (Tr. at 124.)

{¶ 10} On cross-examination, Harmon stated that upon entering the residence his biggest concern was the safety of everybody involved and searched the duplex for an additional victim or the suspect. (Tr. at 139.) Harmon acknowledged that, despite all of the

blood at the scene, he did not know what happened or "how [all the blood] got there." (Tr. at 141.) Harmon stated that since he had been in the other residence, he understood the layout of the attic. (Tr. at 145.) Harmon acknowledged that Huish's presence in the attic startled him. (Tr. at 146.) Harmon testified that preservation of life is most important in those situations. (Tr. at 147.) Harmon stated that he made the decision to tackle Huish because "[m]y weapon was holstered, I was getting ready to place him into handcuffs, it would have taken too much time to draw my weapon and it would also have been exceedingly dangerous to engage in a gunfight in the confines of the attic and based on the layout and where officers were." (Tr. at 149.) Harmon found no weapons on Huish during the arrest. (Tr. at 151.)

{¶ 11} Officer Sean Mottinger testified that he has been employed with the Columbus Division of Police for six years. On August 12, 2019, Mottinger was on "a walkie crew assignment, so that typically means I'm on a bicycle here and there, so I had a different uniform on that day, I believe. * * * The tone drop was I believe a shooting that came in on Stoddart and I jumped into a cruiser with Officer Harmon, the officer that testified earlier." (Tr. at 160.) Upon arriving at the scene, Mottinger followed the blood trail up to the residence. (Tr. at 163.) Mottinger described the inside of the residence as having a significant amount of blood on the walls. (Tr. at 163.) Mottinger testified that he followed Harmon as he knocked down the door and searched the first half of the double unit. Mottinger described using a "Halligan tool" to pry open the attic door. (Tr. at 163-64.) Mottinger stated that they did not find anyone in the first residence. Mottinger and the other officers concluded that the other side of the duplex needed to be searched due to the shared attic space. (Tr. at 165.) Mottinger testified that the door to the other unit of the duplex was open, and the officers proceeded to search the other unit level by level. (Tr. at 165-66.) The officers searched the house until they reached the attic where he heard Harmon yelling commands. Mottinger went up to the attic and observed the suspect. (Tr. at 166.) Mottinger identified Huish in the courtroom as the suspect that was arrested that evening. (Tr. at 167.) At the time of the arrest, Mottinger did not observe any injuries on the suspect. (Tr. at 167.) Mottinger testified that Huish looked impaired during the arrest. (Tr. at 168.) Mottinger concluded the search and observed two bottles of liquor in the attic. (Tr. at 172.)

{¶ 12} On cross-examination, Mottinger conceded that he did not know what happened the moment Harmon found Huish in the attic. (Tr. at 177.) Mottinger also acknowledged he had never met Huish before that night. On redirect examination, Mottinger testified that he smelled alcohol on Huish. (Tr. at 180.)

{¶ 13} Dr. Kevin Jenkins testified that he is employed at the Franklin County Forensic Science Center as the Chief Deputy Coroner. (Tr. at 183-84.) Jenkins is a forensic pathologist and licensed to practice medicine in the state of Ohio. Jenkins manages other pathologists in the department as well as performs autopsies. (Tr. at 185.) Jenkins testified as to his educational background and experience in performing autopsies. The state then moved to qualify Jenkins as an expert in the field of forensic pathology. Without objection from the defense, the trial court deemed Jenkins an expert in the field. (Tr. at 188-89.)

{¶ 14} Jenkins performed an autopsy of the decedent, Ce'Marlo Fletcher, on August 13, 2019. (Tr. at 192.) Jenkins prepared a report as to the results of the autopsy. (Tr. at 193.) Jenkins testified as to Fletcher's injuries stating "[o]n the external examination there was an injury on the left upper chest consistent with a stab wound. And there was medical intervention to include sutures across the chest, and the -- some scattered abrasions, bruises, scrapes on knees." (Tr. at 196.) Jenkins testified the wound was 2.4 centimeters wide, approximately four inches deep, and oriented horizontally on the chest. (Tr. at 197, 200.) Jenkins explained that because the knife did not hit any bone or cartilage there is no way to determine how much force was asserted to inflict the stab wound. (Tr. at 200.) Jenkins stated that were also abrasions on the decedent's "left cheek and right elbow, right eyebrow, left forearm, left wrist, left hip and left knee." (Tr. at 201.) According to Jenkins, these abrasions were all recent. (Tr. at 202.) Jenkins concluded, based on a reasonable degree of medical certainty, that the decedent's cause of death was a stab wound to the chest and the manner of death was a homicide. (Tr. at 214.)

{¶ 15} On cross-examination, Jenkins acknowledged that there was no way for him to determine how those abrasions occurred. (Tr. at 217.) Jenkins also conceded that he could not say what Fletcher was doing at the time that these wounds were inflicted. (Tr. at 219.) Jenkins noted that "homicide" was defined as death caused by the actions of someone else, and his designation has no bearing on whether the other person was justified in those actions. (Tr. at 222-23.)

{¶ 16} Erika Jury testified that she moved into the 382 Stoddart Avenue residence in 2017. (Tr. at 233.) Jury described the residence as a two-bedroom duplex. (Tr. at 237.) When Jury first moved into the duplex, Huish was the only other occupant. (Tr. at 234.) Jury testified the Huish was also a tenant and worked as the caretaker for the actual landlord of the property. (Tr. at 240.) Jury initially moved into the bedroom on the second floor but, after a few months, she moved to the attic. (Tr. at 235-36, 240-41.) Jury testified that two other roommates, Benjamin Gibson and Ce'Marlo Fletcher, would later move into the duplex. Gibson later started to live with someone else but maintained his room at the duplex to store his property. (Tr. at 246.) Jury testified that Fletcher moved into the smallest bedroom on the second floor. (Tr. at 248-49.) Huish stayed in the dining room and would use a red curtain at the doorway to section off his two rooms of the house. (Tr. at 250.) Jury testified that Fletcher moved out for a brief time but returned. (Tr. at 256-57.) According to Jury, Fletcher and Huish did not socialize, but they also did not have any disagreements prior to the night in question. (Tr. at 259.)

{¶ 17} On August 12, 2019, Jury had worked an evening shift at BP between the hours of 10:00 p.m. to 6:00 a.m. (Tr. at 259.) That morning, Jury returned home from work, socialized with her boyfriend, Armon Jones, at her residence and went to sleep around 10:30 a.m. (Tr. at 260-61.) Jury woke up in the evening and caught the bus to work around 9:00 p.m. (Tr. at 263.) Jury testified that Huish was the only one home when she left for work. (Tr. at 264.) According to Jury, Fletcher called her around 9:30 p.m. about his missing PlayStation 4. After some discussion with Fletcher, they determined that Jones had taken the PlayStation 4. (Tr. at 266.) Jury ultimately offered to pay for the stolen PlayStation 4. (Tr. at 267.) That evening, Jury received a notification on her phone of a shooting on Stoddart Avenue. (Tr. at 267.) The detectives later interviewed her at work. (Tr. at 268.) Jury stated that she spoke to the detectives a second time about the events of the day and provided information about the stolen PlayStation 4. Jury testified that while Fletcher was taller than Huish, Huish was noticeably heavier than Fletcher. (Tr at 269-70.)

{¶ 18} On cross-examination, Jury acknowledged that Fletcher yelled during their telephone conversation. (Tr. at 274.) Jury testified that she had never heard Fletcher that upset. Jury conceded that she did not know what happened after she got off the phone with Fletcher. (Tr. at 277.) According to Jury, Fletcher told her that he was going to ask Huish

for his rent money back and was going to move out. (Tr. at 277.) Jury recalled telling law enforcement that Fletcher had a bad temper. (Tr. at 281.) On redirect examination, Jury testified that she had never seen Fletcher become physically violent.

{¶ 19} Detective Richard Bair testified that he has been employed with the Columbus Division of Police since 1995. (Tr. Vol. III at 11-12.) Bair has been a detective with the Crime Scene Search Unit since July 2008. (Tr. at 11.) Bair described the Crime Scene Search Unit as the "third responders" and stated, "we meet up with the detectives that called us out there. They will do a walk-through of the scene with us. * * * They will go over what they want at the scene so we're basically working under the direction of the detective." (Tr. at 15-16.) Bair described taking photographs and fingerprints, collecting evidence, making sketches, and taking DNA samples at the Stoddart Avenue property. (Tr. at 18.) "[W]e w[a]nt to capture the scene so we want to be able to show this is what it looked like when we got in." (Tr. at 18.)

{¶ 20} On August 12, 2019, Bair arrived at 382 Stoddart Avenue at approximately 1:56 a.m. (Tr. at 23.) According to Bair, he walked through the crime scene with Detective Titus on what items they wanted collected and marked evidence for photographs. (Tr. at 23.) Bair testified to a series of photographs that were taken at the scene. (Tr. at 27.) Bair stated that he took the photographs, and another detective collected the physical evidence. According to Bair, he was present during the entire collection process. (Tr. at 49.) Bair also testified to the swabs taken from the knife recovered at the scene. (Tr. at 54.) Bair testified to the various samples as well as the liquor bottle collected in the attic of 384 Stoddart Avenue. (Tr. at 53.) According to Bair, all the exhibits that he reviewed appeared to be in substantially the same condition as when they were collected at the scene. (Tr. at 56.) Bair acknowledged that he was not involved in analyzing the DNA samples. (Tr. at 56.)

{¶ 21} On cross-examination, Bair conceded that he did not know how the blood ended up on the wall or floor. (Tr. at 60.) Bair testified, "it looks like someone was wounded and they bled a lot in a lot of different places." (Tr. at 60.) After a review of a photograph, Bair stated the liquor bottle, when it was recovered, appeared "fairly full." (Tr. at 64.)

{¶ 22} Benjamin Gibson testified that he moved into the Stoddart Avenue residence in 2016. (Tr. at 71.) Gibson heard about the vacancy from Jury when they worked together at the BP on Stringtown Road. (Tr. at 72.) Gibson moved into the second-floor room at the

end of the hallway and paid $200 in rent per month. (Tr. at 73-74.) Gibson described Huish as the landlord and characterized their relationship as "friend kind of acquaintances." (Tr. at 76.) According to Gibson, Fletcher moved into the residence around 2018. (Tr. at 77.) Gibson stated that they were friends and would socialize over their shared love of music. (Tr. at 78.) Gibson testified that, around August 2019, he was "in and out" of the duplex as he was living with someone else at the time. (Tr. at 79.) Gibson moved out around April and used the room primarily for storage. (Tr. at 81.) Gibson returned once a week to give Huish money for rent.

{¶ 23} On August 12, 2019, Gibson was working as a dishwasher and prep cook at the Franklin Park Conservatory. (Tr. at 83.) After work, Gibson returned to his residence at 62 Dunkin Street. At around 7:30 p.m., Gibson went to the Stoddart Avenue property to pay his rent and return a video game to Fletcher. (Tr. at 86.) According to Gibson, he went to Fletcher's room to return the video game and noticed that the PlayStation 4 was missing. Gibson then spoke to Huish about the PlayStation 4, but Huish said he did not know anything about it. (Tr. at 90.) Gibson recalled Huish was drinking a Bloody Mary that night. (Tr. at 90.) Gibson helped program Huish's phone and chatted with him for approximately 10-20 minutes. (Tr. at 91.) According to Gibson, he left the residence around 8:30 p.m. (Tr. at 91.) Gibson stated that he later received a call from Fletcher around 9:10 p.m. (Tr. at 92-93.) Gibson testified that Fletcher was pretty upset about the missing PlayStation 4. That was the last time Gibson spoke to Fletcher. According to Gibson, he received a call from Jury the next morning, and she told him what had happened. (Tr. at 95.)

{¶ 24} On cross-examination, Gibson stated Fletcher had a temper and was upset during their telephone call on August 12, 2019. (Tr. at 101.) According to Gibson, Huish was not upset or angry when he left the duplex. (Tr. at 102.) Gibson acknowledged that he did not know what happened in the house the night of the incident. (Tr. at 102-03.) On redirect examination, Gibson recalled that the door on Fletcher's room would not lock. (Tr. at 104.) "[H]is door didn't even have hinges on it." (Tr. at 104.) Gibson also testified he had never seen Fletcher become violent. (Tr. at 105.)[2]

---

[2] Prior to the testimony of Hope Olson, the parties entered into a series of stipulations that were read into the record. (Tr. 108-10.)

{¶ 25} Hope Olson testified that she is a forensic scientist in the DNA Section of the Columbus Police Crime Lab. Olson testified that she has been with the crime lab for approximately six and one half years. (Tr. at 111-12.) Olson testified to her education background and experience in the field. Olson was subsequently qualified as an expert without objection. (Tr. at 115.) Olson described the process of analyzing DNA and what information is included in a DNA profile. (Tr. at 118-19.) Regarding the August 12, 2019 incident, Olson testified as to certain pieces of evidence submitted for examination. Olson stated that the blood collected from the samples were consistent with the DNA of Fletcher. (Tr. at 122-123.) Olson noted that it is rare to find DNA samples under someone's fingernails even when there is an altercation. (Tr. at 128.) Olson testified that the swabs tested from the blade of the knife were consistent with the DNA profile of Fletcher. (Tr. at 125.) Olson also concluded that the DNA profile from the stain on Huish's shirt was a mixture of DNA from Huish and Fletcher. (Tr. at 130, 132.) Olson explained "[b]ecause I knew that this was Gregory Huish's shirt, it's assumed that his DNA could be on the item. It's reasonable to assume that his DNA would be on his own shirt." (Tr. at 131.)

{¶ 26} On cross-examination, Olson explained the inherent difficulties in theorizing why DNA was left in some place but not others. "It's just really hard because as I mentioned before trace DNA doesn't act the same way every single time. A different fabric of shirt may be better than another fabric. The whole circumstance, it's winter maybe someone's skin is a little more dry than in the summertime. So there's so many factors that we are not aware of without actually being at the scene that can play a part at leaving DNA behind." (Tr. at 137-38.) Olson acknowledged that without being at the scene during the incident, she could not know what happened. (Tr. at 139.)

{¶ 27} Detective Brent Close testified that he has been employed by the Columbus Division of Police for approximately 23 years and a homicide detective for nearly two and one half years. (Tr. at 144-45.) On the evening of August 12, 2019, Close was notified around 11:00 p.m. about a potential homicide at 382 Stoddart Avenue. (Tr. at 157-58.) Law enforcement obtained a search warrant for both the 382 and 384 Stoddart Avenue properties. (Tr. at 164-65.) Close described the scene as follows: "[t]here was obvious blood inside the house, quite a bit of blood inside the living room of 382. It -- it actually showed a path from the living room to the back door of the duplex out to the * * * back door and along

the sidewalk." (Tr. at 160.) Close conducted interviews with officers and civilians at the scene. (Tr. at 163-64.)

{¶ 28} Close testified to conducting an interview at CPD headquarters with Huish about the incident. (Tr. at 167.) According to Close, Huish stated that Fletcher came home from work and accused him of stealing his PlayStation 4. "He said that Mr. Fletcher was very angry, yelling and screaming." (Tr. at 167.) Huish left the residence and spoke to his neighbor that was outside on his porch. Huish then went back inside the house and started to cook in the kitchen. (Tr. at 167.) Fletcher again confronted Huish and pushed him multiple times. According to Close, Huish stated that he then grabbed a butcher knife from the kitchen and "chased Mr. Fletcher to the front door. Once [in the living room near the front door], * * * [Huish] was telling Mr. Fletcher to get away from him and to get out of his house." (Tr. at 168.) Close testified that Huish recalled "Mr. Fletcher pushed Mr. Huish again and/or that was when he struck him. And then during that altercation in the living room Mr. Huish stated that he stabbed Mr. Fletcher with a knife." (Tr. at 168-69.) Huish admitted that he did not see a weapon on Fletcher during the incident. (Tr. at 169.) Close stated that there were no injuries to Huish's knuckles. (Tr. at 181.) Close testified the Huish consented to have his DNA collected. (Tr. at 172.) The state then played the recorded interview between Close and Huish for the jury. (Tr. at 178.)

{¶ 29} Close testified that he went to the BP station to interview Jury who was able to provide Fletcher's Facebook information. Fletcher was later identified through fingerprints. (Tr. at 171.) There was also a surveillance video from a neighboring house but the quality was described as "very poor." (Tr. at 173.)

{¶ 30} On cross-examination, Close conceded the Huish was cooperative during the interview. While Huish admitted to having a couple drinks that evening, Close acknowledged that Huish did not appear intoxicated during the interview. (Tr. at 194.) Close also testified that he was informed by the other officers that Huish said, "[h]e attacked me" during the arrest. (Tr. at 196.) Close conceded that he did not ask Huish if he was fearful for his life or if Huish felt like he had no other choice but to use the knife. (Tr. at 200-01.) When Close asked why Huish hid in the attic, Huish responded, "[y]eah, I don't have a good reason for why I did what I did. I just F'd up and ran and hid." (Tr. at 210.) Close acknowledged that everyone reacts differently to stressful situations. (Tr. at 210.)

**{¶ 31}** On redirect examination, Close noted that the interview occurred three hours after the time of arrest, which provided time for the effects of alcohol to dissipate. (Tr. at 212-13.) Close testified that he was concerned about why Huish went next door and did not call the police. (Tr. at 214.) Close also said that Huish admitted during the interview that Fletcher did not push him into anything. (Tr. at 215.) Close stated that he did not follow up with Huish's statement that he "fucked up [his] life" because Huish already said that "he shouldn't have grabbed the knife, he shouldn't have stabbed him." (Tr. at 217.)

**{¶ 32}** The state rested its case and moved to admit its exhibits. Counsel for appellant then moved to dismiss the indictment under Crim.R. 29 contending that the state did not meet its burden in the case. The state opposed the motion positing that, considering the facts favorable to the state as required under the rule, the elements of each offense were met. (Tr. at 228-29.) The trial court denied the motion finding that reasonable minds could differ as to whether there was sufficient evidence to sustain a conviction.

**{¶ 33}** Prior to appellant's testimony, the parties convened regarding the proposed jury instructions. (Tr. Vol. IV. at 5.) Relevant to the instant appeal, the trial court denied appellant's request for an unanimity jury instruction on self-defense. (Tr. at 10.) The trial court concluded that self-defense calls for an alternative means instruction citing *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787 as illustrative on this issue. (Tr. at 9.) The trial court stated: "The jury finding different reasons as to why they think the state did or did not disprove self defense does not reflect a disagreement of the facts pertaining to the defendant's conduct. The actual determination is if the agreed-upon facts could be interpreted as satisfying the necessary elements of self defense or if not." (Tr. at 9-10.)

**{¶ 34}** Gregory Huish testified that he moved into the 382 Stoddart Avenue residence in 2015. (Tr. at 17.) According to Huish, a friend owned the property and allowed Huish to live in the house in exchange for helping him maintain his other various properties. (Tr. at 19.) Huish was also paid $25 per week for this work. In 2019, three other tenants resided in the Stoddart Avenue duplex. (Tr. at 22.) According to Huish, he only interacted with Fletcher as they were coming and going in the house. (Tr. at 30.) Huish did not have any problems with Fletcher prior to the incident. (Tr. at 32.)

**{¶ 35}** The morning of August 12, 2019, Huish cut the grass at five buildings in the neighborhood and returned to the house in the early afternoon. (Tr. at 32.) Huish testified

that he got cleaned up and went to purchase a new cellphone at Target. (Tr. at 35.) At 4:00 p.m., Huish returned home and decided to make dinner (Tr. at 37.) At around 6:30 p.m., Gibson came by the duplex and programmed Huish's new phone. (Tr. at 38.) Huish testified that he had consumed two drinks at this point in the evening. (Tr. at 42.)

{¶ 36} Huish testified that Fletcher, shortly after returning home, stormed downstairs asking about his PlayStation 4. (Tr. at 43.) Huish denied taking anything out of Fletcher's room. After some discussion, Fletcher returned upstairs. Huish left the residence and spoke with his neighbor who was outside reading a book. According to Huish, he could hear Fletcher yelling inside the house. (Tr. at 45-46.) Huish estimated that he was outside for five to ten minutes. (Tr. at 48.) Huish returned to the kitchen and started cleaning up when Fletcher came back downstairs. According to Huish, Fletcher was upset and began yelling about the PlayStation 4. Fletcher asked if Huish left the house open, which he denied. (Tr. at 51.) Fletcher again returned to his room. Huish proceeded to prepare a snack in the kitchen. (Tr. at 53.)

{¶ 37} Fletcher returned to the kitchen for a third time. According to Huish, Fletcher kept screaming about the missing PlayStation 4. (Tr. at 58.) Huish testified that Fletcher began pushing him and "hitting me in the chest right here, [saying] you owe me." (Tr. at 60.) Huish testified that at this point he was trying to ignore Fletcher. Huish eventually told Fletcher "[t]his is not my problem." (Tr. at 63.) "Ce'Marlo was pushing -- was pointing at me and stuff and I had nothing to do with this, I don't want anything to do with this, I grabbed the knife and I grabbed my drink and I walked into the kitchen ignoring him." (Tr. at 66.) Huish went into his bedroom at which point Fletcher followed "yelling at me the whole time." (Tr. at 66.) When asked why Huish had the knife, he stated, "I pulled out the cutting board and I was gonna get the cheese and the crackers and all the stuff and pile it up on there. And in front of me was my drink and the knife, and I can't carry everything at once." (Tr. at 67.)

{¶ 38} Huish denied that he threatened Fletcher with the knife, but he acknowledged that he told Fletcher to get out of the house. (Tr. at 67.) Huish stated that Fletcher then started to grab his shirt before Huish pushed him away. (Tr. at 74.) According to Huish, Fletcher then hit him on the side and was up against the wall on top of the bed. "All I remember is I grabbed that knife and I hit it -- I hit him with it." (Tr. at 75.) Huish

said that he "thought he'd kill me." (Tr. at 76.) According to Huish, he "freaked out and I just ran out of the room." (Tr. at 76.) Huish stated he grabbed the vodka and cranberry juice on the way to the other house. (Tr. at 78.) Huish thought that Fletcher would not look in the other unit. (Tr. at 79.) Huish was later found in the attic and placed under arrest. (Tr. at 80.) According to Huish, he was hiding from Fletcher. (Tr. at 81.) Huish does not remember hearing the police come into the duplex. (Tr. at 84.)

{¶ 39} Huish denied that he ever chased Fletcher to the front door despite his earlier statement during the interrogation to that effect. (Tr. at 86.) Huish stated that he did not believe he had any other choice but to use the knife. (Tr. at 87-88.) Huish denied that he realized the severity of Fletcher's injury. "I just threw it. I just picked it up and grabbed it and hit him with it." (Tr. at 92.) Huish does not remember telling police that if he had not had a couple drinks this may not have happened. (Tr. at 89.) Huish also admitted to throwing the knife above the cabinets. (Tr. at 91.) "I just threw it up there and then I went upstairs." (Tr. at 91.)

{¶ 40} On cross-examination, Huish conceded that he did not have a great frame of reference for Fletcher's emotions. (Tr. at 95.) Huish admitted that since there is no written lease, if a dispute arose, the only remedy available to Fletcher was to ask for his money back. (Tr. at 96.) Huish testified that he started drinking around 4:00 p.m. while he was cooking dinner. Huish acknowledged there was an empty bottle of liquor on the kitchen counter. (Tr. at 102.) While Huish admitted that he told police, "I wish I wouldn't have had a few cocktails, I wouldn't be here," he did not remember saying it. (Tr. at 105-06.) While Huish told law enforcement his last drink was between 8:00-9:00 p.m., he admitted that was not true since he had a drink when speaking with Atchley after 9:30 p.m. (Tr. at 107.) Huish also conceded that he had a drink in his hand when arguing with Fletcher after 10:00 p.m. Huish admitted that he was generally not afraid of Fletcher and never called the police on him. (Tr. at 110.) Huish testified that Fletcher pushed him in the kitchen but not into anything. (Tr. at 113.) While Huish does not remember telling police that he "chased Ce'Marlo into that front room," he admitted he made the statement during the interrogation. (Tr. at 115.) Huish conceded that his testimony at trial was the first time he said that he went into the living room before Fletcher. (Tr. at 115.) While Huish told police, "I chased him out to the front door," Huish denied that ever happened. (Tr. at 115.) Huish

admitted that while he told police that he could not remember when Fletcher punched him in the side, he testified at trial that it was in the front room. (Tr. at 119.) Huish acknowledged that he was getting upset after Fletcher kept accusing him of something he did not do. (Tr. at 133.) Huish conceded that Fletcher never had a weapon. (Tr. at 125.)

{¶ 41} On redirect examination, Huish testified that he was not drunk during the evening. Huish reiterated that he did not feel like he had any other choice that night and did not think he could have done anything different under the circumstances. (Tr. at 139.) On re-cross, Huish admitted that he did not seek medical care for his purported injuries after the incident. (Tr. at 143.)

{¶ 42} At the conclusion of Huish's testimony, the defense rested its case and moved to admit its exhibits. Without objection from the state, the trial court admitted the exhibits. Defense counsel then renewed his Crim.R. 29 motion, which the trial court denied. (Tr. at 145.) The jury returned a verdict of guilty on all counts.

{¶ 43} On April 15, 2021, the trial court conducted a sentencing hearing in this matter. The trial court found that Count One merged with Count Two and sentenced appellant to 15-years-to-life in prison to run concurrent with a 36-month term of incarceration on Count Three. The trial court awarded appellant 610 days of jail-time credit.

{¶ 44} Appellant filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 45} Appellant assigns the following as trial court error:

> [1] Huish's murder conviction should be reversed because the trial court did not give a specific unanimity instruction on self-defense when it was required to.
>
> [2] Huish's murder conviction must be reversed because the trial court incorrectly instructed the jury on the law of self-defense.
>
> [3] Huish's murder conviction must be reversed because the instructions on self-defense were conflicting and confusing.
>
> [4] Huish's convictions should be reversed because trial counsel was prejudicially ineffective for failing to object to the jury instructions and verdict forms, requiring reversal of Huish's convictions.
>
> [5] This Court should overturn its decision to find that self-defense does not fall under the sufficiency of the evidence standard.

[6] The State's evidence was insufficient to disprove self-defense, thus Huish's conviction for murder was legally insufficient.

[7] The evidence weighed manifestly against convicting Huish of Murder

(Sic passim.)

## III. LEGAL ANALYSIS

### A. Appellant's First Assignment of Error

{¶ 46} In appellant's first assignment of error, he argues that the trial court erred by not providing a specific unanimity instruction on self-defense. Appellant argues that "[b]ecause a 'patchwork' of less than a unanimous verdict occurred here, and because the State's burden to disprove self-defense is a division of two or more 'distinct conceptual groupings,' the jury had to be instructed specifically that it must unanimously conclude that Huish committed acts falling within one such grouping on the question of self-defense, to reach a guilty verdict." (Appellant's Brief at 17.)

{¶ 47} The trial court is tasked with providing all jury instructions relevant and necessary for the trier of fact to weigh the evidence and determine the facts. (Further citation omitted.) *State v. Ross*, 10th Dist. No. 17AP-141, 2018-Ohio-3027, ¶ 31. We review a trial court's refusal to provide a requested jury instruction for an abuse of discretion. *Id.*, citing *State v. Kimkhe*, 10th Dist. No. 11AP-433, 2012-Ohio-1964, ¶ 12; *State v. Smith*, 10th Dist. No. 01AP-848, 2002 Ohio App. LEXIS 1507 (Apr. 1, 2002), citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion is a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983).[3]

{¶ 48} In most instances, a general instruction that the jury must resolve the case unanimously is sufficient. *State v. Boyd*, 10th Dist. No. 14AP-961, 2015-Ohio-5116, ¶ 14, citing *State v. Johnson*, 46 Ohio St.3d 96, 104 (1989) *overruled on other grounds* by *State v. Jenks*, 61 Ohio St.3d 259, 282 (1991); *see also* Crim.R. 31 ("The verdict shall be unanimous. It shall be in writing, signed by all jurors concurring therein, and returned by the jury to the judge in open court."). The jury "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which

---

[3] At oral arguments, appellee conceded that appellant's first assignment of error was preserved. As such, we will review the matter under an abuse of discretion analysis.

of several possible means the defendant used to commit an element of the crime." (Further citation and quotation omitted.) *State v. Caldwell*, 10th Dist. No. 18AP-814, 2019-Ohio-3015*, ¶* 19. However, when "a single count can be divided into two or more 'distinct conceptual groupings,' the jury must be instructed specifically that it must unanimously conclude that the defendant committed acts falling within one such grouping in order to reach a guilty verdict." *Johnson* at 104, quoting *States v. Gipson*, 553 F.2d 453, 458 (C.A. 5, 1977). The critical inquiry is whether the case concerns "alternative means" or "multiple acts." *Gardner* at ¶ 48. In *Caldwell*, we examined these concepts writing:

> Alternative means cases involve situations "where a single offense may be committed in more than one way * * *." *Gardner* at ¶ 49. In those matters there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means." *Id.* Multiple acts cases, on the other hand, include scenarios where several acts are alleged and any one of them could constitute the crime charged. *Id.* at ¶ 50. In these cases,["]the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.["] *Id.* * * * In sum, alternative means cases require unanimity only as to guilt but not as to means. In contrast, multiple act matters require unanimity as to guilt and as to means.

*Caldwell* at ¶ 20.

**{¶ 49}** This court has found that the revisions to R.C. 2901.05(B)(1) has placed the burden on the state to disprove at least one of the elements of self-defense beyond a reasonable doubt. *See State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31. Therefore, the state must show beyond a reasonable doubt that Huish: "(1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." (Capitalization sic.) *Carney* at ¶ 31, citing R.C. 2901.05(B)(1).

{¶ 50} After consideration of the relevant case law and record at issue, the trial court did not abuse its discretion by denying appellant's request for a unanimity instruction on self-defense as there is no requirement that the jury be unanimous as to which element of self-defense they believed the state disproved. As cited by the trial court, *Gardner* provides the most instructive language on this issue. "In situations where 'the alternatives of mens rea [intent] component give rise to the same criminal culpability, it does not appear critical that the jury may have reached different conclusions regarding the nature of the defendant's intent if such differences do not reflect disagreement on the facts pertaining to the defendant's conduct.' " *Gardner* at ¶ 68, quoting *State v. Suggs*, 209 Conn. 733, 763, 553 A.2d 1110 (1989). Moreover, the Supreme Court of Ohio noted that when there is a "single conceptional grouping of related facts," "no specific instruction is necessary, because in such a case, the alternatives presented to the jury are not conceptually distinct, and a 'patchwork' verdict is not possible." *Gardner* at ¶ 52, quoting *State v. Johnson*, 46 Ohio St.3d 96, 104 (1989). As such, even assuming arguendo that the jury was split on the which elements of self-defense the state disproved, each juror concluded beyond a reasonable doubt that appellant murdered Fletcher, and he was not acting in self-defense. Therefore, it does not deprive appellant of a unanimous verdict if the jury reached different conclusions as to why he did not act in self-defense since the alternatives presented to the jury were not conceptually distinct. Accordingly, the trial court's analysis in this regard is not wholly unreasonable. Appellant's first assignment of error is overruled.[4]

**B. Appellant's Second and Third Assignments of Error**

{¶ 51} In appellant's second assignment of error, he argues the trial court erred by incorrectly instructing the jury on the law of self-defense. In appellant's third assignment of error, he argues the trial court erred as its instruction on self-defense was conflicting and confusing. For harmony of analysis, we will address both assignments of error together.

{¶ 52} Prior to revisions in R.C. 2901.05, Ohio law considered self-defense an affirmative defense that required a defendant to demonstrate the elements of self-defense by a preponderance of evidence. *See, e.g., State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 45, citing *State v. Martin*, 21 Ohio St.3d 91, 93 (1986). Effective March 28,

---

[4] In appellant's first assignment of error, he also argues that the instructions could create confusion for the jury. (Appellant's Brief at 16.) Appellant's arguments overlap with those presented in his third assignment of error. We will address these arguments in the subsequent section of this decision.

2019, the General Assembly revised R.C. 2901.05 to "place[] the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *Carney* at ¶ 31, citing R.C. 2901.05(B)(1); 2019 Am.Sub.H.B. No. 228. In relevant part, R.C. 2901.05(B)(1) provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶ 53}** Consequently, the state is required " 'to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger.' " *State v. Messenger,* 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 36, quoting *Carney* at ¶ 31.

**{¶ 54}** A jury instruction requested by the parties in a criminal case must be given when it is "relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." *State v. Angel*, 10th Dist. No. 19AP-771, 2021-Ohio-4322, ¶ 67, quoting *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). A jury instruction must also be appropriate under the facts of the case. *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46, citing *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, ¶ 5. When reviewing errors in a jury instruction, a trial court must consider a jury charge as a whole. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 35-36. "An unnecessary, ambiguous, or even affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error." *Id.* A reviewing court will examine the giving, or not giving, of a jury instruction under an abuse of discretion analysis. (Further citation omitted.) *State v. Robinson*, 10th Dist. No. 17AP-853, 2019-Ohio-558, ¶ 30. When a jury instruction incorrectly states the law, "a reviewing court applies a mixed de novo and abuse of discretion standard of review," examining "the jury charge as a whole and must determine

whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." (Internal citations and quotations omitted.) *State v. Rutledge*, 10th Dist. No. 17AP-590, 2019-Ohio-3460, ¶ 31.

{¶ 55} An appellant who fails to object as required by Crim.R. 30(A)[5] "is precluded from claiming error in the instructions to the jury unless the instructions constitute plain error under Crim.R. 52(B)." *State v. McCown*, 10th Dist. No. 06AP-153, 2006-Ohio-6040, ¶ 36. Crim.R. 52 states "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Here, counsel for appellant failed to object to the alleged issues in the jury instructions before the trial court. As such, we will examine the claimed errors under a plain error analysis.

{¶ 56} In *State v. Vinson*, 10th Dist. No. 19AP-574, 2022-Ohio-2031, we explained the limitations of plain error review:

> "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240 (2002). Second, to be considered plain, the error asserted "must be an 'obvious' defect in the trial proceedings." *Id.*, citing *State v. Sanders*, 92 Ohio St.3d 245, 257, 2001-Ohio-189, 750 N.E.2d 90 (2001). Third, the error in question "must have affected substantial rights" by "affect[ing] the outcome of the trial." *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, ¶ 33, 92 N.E.3d 821, quoting *Barnes*, 94 Ohio St. at 27. In other words, "the accused is 'required to demonstrate a reasonable *probability* that the error resulted in prejudice' " to show plain

---

[5] Crim.R. 30(A) states:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its instructions to the jury prior to counsel's arguments. The court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record.

> On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

error. *Id.*, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22, 38 N.E.3d 860.

"Even if a forfeited error satisfies these three prongs, however, Crim.R. 52(B) does not demand that an appellate court correct it" because the rule "states only that a reviewing court 'may' notice plain forfeited errors; a court is not obliged to correct them." *Barnes*, 94 Ohio St.3d at 27. Thus, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*Vinson* at ¶ 32-33.

{¶ 57} The Supreme Court of Ohio has found that an erroneous jury instruction does not meet the plain error threshold unless, " 'but for the error, the outcome of the trial clearly would have been otherwise.' " *McCown* at ¶ 38, *quoting State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus; *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, ¶ 56, citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus.

{¶ 58} Appellant first argues that the jury was not told that it had the option to find him not guilty if the state did not meet its burden of proof. "Rather, the transcripts reveal that the Jury was instructed to find Huish guilty if the State failed to meet its burden to disprove self-defense." (Appellant's Brief at 20.)

{¶ 59} Upon review, we do not find the purported error in the jury instructions warrants reversal under plain error review. As identified by appellant, there is a clear typographical error in the jury instructions. The written instructions inadvertently wrote "find the not defendant guilty" instead of "find the defendant not guilty." (Mar. 31, 2021 Jury Instructions at 10.) While this is an obvious typographical error, we cannot say that this error affected appellant's substantial rights by impacting the outcome of the trial. We must examine jury instructions as a whole. *Cromer* at ¶ 35-36. The jury instructions repeatedly make clear that the state must prove beyond a reasonable doubt every essential element of the offense. (*See* Jury Instructions at 2, 5-8.[6]) If the state met this burden, the

---

[6] *See, e.g.,* "The defendant must be acquitted of an offense unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense." *Id.* at 2; *see also id.* at 6, "If you fail to find that the State proved beyond a reasonable doubt all the elements of Murder as charged in Count One of the indictment, you shall find the Defendant not guilty," *see also id.* at 8, "If you find that evidence was presented that tends to support the finding that the defendant used deadly force in self-defense, the State must prove beyond a reasonable doubt that the defendant did not use deadly force in self defense."

jury was then to engage in a self-defense analysis. (Jury Instructions at 6.) Moreover, the location of the typographical error provides further mitigation for any potential prejudice to appellant. The instructions read, "If you find that the State proved beyond a reasonable doubt all of the elements of Murder and that the State proved beyond a reasonable doubt that self-defense does not apply, you must find the defendant guilty according to your findings." The subsequent paragraph then read, "If you find that the state failed to prove beyond a reasonable doubt any of the elements of Murder or if you find that the state failed to prove beyond a reasonable doubt that self-defense does not apply, you must find that the not defendant guilty according to your findings." (Jury Instructions at 10.) Furthermore, other provisions of the jury instructions reinforce the state's burden when engaging in self-defense analysis. *See, e.g.*, March 31, 2021 Jury Instructions at 8, "[s]tate must prove beyond a reasonable doubt that the defendant did not use deadly force in self-defense."; *see also id.* at 10, "[i]f you find that the State proved beyond a reasonable doubt all of the elements of Murder and that the State proved beyond reasonable doubt that self-defense does not apply, you must find the defendant guilty according to your findings"). It is well-established law that ambiguous or even erroneous provisions of a jury instruction do not inevitably constitute reversible error. *Cromer* at ¶ 35-36. Here, the instructions were clear as to the state's burden to demonstrate, beyond a reasonable doubt each element of the charged offenses. The instructions also made clear that the state was to disprove self-defense beyond a reasonable doubt. As such, considering the instructions as a whole, the typographical error was harmless as there was no reasonable probability that the error resulted in prejudice.

{¶ 60} Appellant next argues that the trial court erroneously instructed the jury that "it had the burden to decide whether self-defense must [be] addressed by them at all." (Appellant's Brief at 18.) Appellant cites the provision of the jury instruction that reads "[i]f you find that evidence was presented that tends to support the finding that the defendant used deadly force in self-defense," as support for this argument. (Jury Instructions at 8.) Appellant contends that the jury could have decided not to consider self-defense at all requiring reversal. We disagree.

{¶ 61} This instruction at issue addresses appellant's duty of production when asserting self-defense. "The plain language of R.C. 2901.05(A) reflects that self-defense is

still an affirmative defense and that the burden of production is still on the defendant." *State v. Messenger*, __Ohio St.3d__, 2022-Ohio-4562, ¶ 21.[7] Furthermore, the subsequent portion of the sentence relieves any further tension on this issue reading, "the State must prove beyond a reasonable doubt that the defendant did not use deadly force in self-defense." (Jury Instructions at 8.) The jury instructions accurately state the law on this issue. We emphasis that *Messenger* provides that this burden of production is "not a heavy one and that it might even be satisfied through the state's own evidence." *Id*. at ¶ 22. As such, we find no error, plain or otherwise, with this instruction.

{¶ 62} Appellant alleges other provisions of the jury instructions are similarly confusing claiming that while the state has the burden to prove beyond a reasonable doubt that self-defense "does not apply," the trial court also told the jury that self-defense may not "apply" at all "if" they found appellant's burden of production was not met. (Jury Instructions at 8, 10.) We disagree. As set forth in the body of the decision, *Messenger* has made clear that while the defendant has the burden of production, the state must prove beyond a reasonable doubt that self-defense does not apply. This requires the state to disprove any one element of self-defense. We are not persuaded that these instructions are conflicting or confusing, and certainly do not rise to the level of plain error.

{¶ 63} Finally, appellant argues that the jury should have been instructed that appellant had no duty to retreat.[8] Here, the trial court did provide the jury some instruction regarding duty to retreat as follows: "[t]he defendant is presumed to have acted in self-defense when using defensive force that was intended or likely to cause death or great bodily harm to another if the person against whom the defensive force was used was in the process

---

[7] *Messenger* further notes "[b]y stating that the burden of persuasion is on the defendant for 'an affirmative defense other than self-defense,' the statute indicates that self-defense falls within the category of affirmative defenses but is excepted from the burden of persuasion. And by stating that the defendant bears the 'burden of going forward with the evidence of an affirmative defense[],' the statute indicates that there are no exceptions to the defendant's burden of production regarding affirmative defenses." *Id*., quoting R.C. 2901.05(B)(1).

[8] Effective April 6, 2021, the General Assembly amended R.C. 2901.09 abolishing the duty to retreat for "any person who was in a place where he/she lawfully had a right to be when he/she used force in self-defense, defense of another or defense of his/her residence." 2 OJI CR 421.21 Comment. We note that appellant was convicted on April 1, 2021. Therefore, the revised language was not in place at the time of the offense or prior to his conviction. The First District Court of Appeals addressed whether R.C. 2901.09 should be applied retroactively. *State v. Parker*, 1st Dist. No. C-210440, 2022-Ohio-3831. The *Parker* court concluded that there is no language in R.C. 2901.09 to suggest that the legislature intended it to apply retroactively. We agree. Accordingly, we acknowledge our analysis on this issue has limited application going forward.

of entering or had entered, unlawfully and without privilege to do so, the residence occupied by the defendant." (Jury Instructions at 10.) However, the trial court also provided an instruction consistent with the state's claim that the presumption did not apply as the victim was a lawful resident and had a right to be in the residence. The instruction read that the presumption does not apply when: "the person against whom the defensive force was used was a lawful resident of or had a right to be in the residence. Even if the state rebuts the presumption of self-defense the state must still prove beyond a reasonable doubt that the defendant did not use the force in self-defense." *Id.* Considering the instructions as a whole, we need not examine whether the inclusion of both provisions constituted error as the language did not affect appellant's substantial rights and impact the outcome of the trial.

{¶ 64} Appellant next argues that the jury instructions "never told [the jury] that the State had to disprove any one element beyond a reasonable doubt." (Appellant's Brief at 11.) Upon review, we disagree that the failure to include language expressly stating that the state must prove beyond a reasonable doubt at least one element of self-defense requires reversal under plain error review. The instructions make clear that, to find appellant guilty, the jury must "find that the State proved beyond a reasonable doubt all of the elements of Murder *and that the State proved beyond a reasonable doubt that self-defense does not apply*." (Emphasis added.) (Jury Instructions at 10.) As such, the ambiguity in the instructions was not necessarily erroneous as the definition of self-defense was provided in an earlier provision of the instructions.⁹ Arguendo, the ambiguity in the instructions could even be perceived to benefit appellant as the instructions could be read to require the state disprove more than one element of self-defense.

{¶ 65} As the instructions are taken as a whole, we find that the instructions provided the jury with the appropriate law and did not rise to the level of plain error. Any typographical errors or minor ambiguities in the language were clarified with other provisions in the jury instructions. As such, we cannot say that any of the cited issues meet the exceedingly high threshold required under plain error.

---

⁹ "Self-Defense" means that (A) the defendant was not at fault in creating the situation giving rise to the affray; and (B) the defendant had reasonable grounds to believe and an honest belief, even if mistaken, that he was in immediate danger of death or great bodily harm; and (C) the defendant did not violate any duty to retreat to avoid the danger, and (D) the defendant used reasonable force." (Jury Instructions at 9.)

{¶ 66} Appellant cites *State v. Flory*, 3rd Dist. No. 15-20-02, 2020-Ohio-5136 and *State v. Parrish*, 1st Dist. No. C-190379, 2020-Ohio-4807 for the proposition that an improper instruction on self-defense requires reversal. However, these cases are distinguishable in several important ways. In *Flory*, the Third District Court of Appeals reversed the defendant's conviction for domestic violence based on conflicting and incorrect instructions. In one section, the *Flory* instructions properly informed the jury that, under R.C. 2901.05(B)(1), the state must disprove self-defense beyond a reasonable doubt. The instructions then erroneously provided a conflicting instruction that required the defendant to prove the elements of self-defense by a preponderance of the evidence. Here, the instructions are consistent with the current version of R.C. 2901.05(B)(1) that it is the states' burden to disprove self-defense beyond a reasonable doubt.

{¶ 67} In *Parrish*, the First District Court of Appeals reversed a judgment of conviction, pursuant to a bench trial, where the trial court failed to apply the amended version of R.C. 2901.05(B)(1). The trial court judge in *Parrish* found the defendant guilty and stated to the defendant, "you prove self-defense, not them. They don't have to disprove it." *Id*. at ¶ 2. The instant case is distinct from *Parrish* most notably as it involves a jury instruction and there is no claim that the jury was instructed on the prior iteration of R.C. 2901.05(B)(1).

{¶ 68} Finally, appellant cites *State v. Harvey*, 3rd Dist. No. 9-04-69, 2005-Ohio-3882 for the proposition that inadequate jury instructions constitute plain error. However, *Harvey* is also inapplicable from the present case as the jury instructions in *Harvey* failed to set forth all of the essential elements of the offense. The defendant was convicted of possession of a deadly weapon but the jury was not instructed at any time that the weapon had to be deadly. As the instructions omitted the word "deadly" from possessing a deadly weapon, "as a matter of law, the jury instructions and verdict forms were not adequate because they did not set forth all of the essential elements of the offense." *Id*. at ¶ 7. *Harvey* is distinct from the present case as all the essential elements of the charged offenses were included in the instructions.[10]

---

[10] Appellant also argues that the trial court erred as there was nowhere for the jury to find him not guilty based on self-defense or a separate finding on the verdict forms. (Apr. 1, 2021 Verdict Forms.) We cannot find that this omission constituted plain error. More extensive examination of the verdict forms is provided in Section E of this decision.

{¶ 69} For the foregoing reasons, appellant's second and third assignments of error are overruled.

### C. Appellant's Fifth Assignment of Error

{¶ 70} In appellant's fifth assignment of error, he argues that this court should overturn our decision in *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044. On October 12, 2021, the Supreme Court accepted review of *Messenger* on this very issue and considered whether self-defense claims may be reviewed on direct appeal for sufficiency of the evidence. In a 7-0 decision, the Supreme Court affirmed this court's decision writing:

> H.B. 228's amendments to R.C. 2901.05 did not eliminate the defendant's burden of production regarding a claim of self-defense. The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal, and the Tenth District correctly declined to review the state's rebuttal of self-defense for sufficiency of the evidence.

*State v. Messenger*, ___Ohio St.3d___, 2022-Ohio-4562, ¶ 27.

{¶ 71} Accordingly, on the authority of the Supreme Court's decision in *Messenger*, we overrule appellant's fifth assignment of error.

### D. Appellant's Sixth and Seventh Assignments of Error

{¶ 72} In appellant's sixth assignment of error, he argues there was insufficient evidence to convict appellant of murder.[11] In appellant's seventh assignment of error, he argues that his conviction for murder was against the manifest weight of the evidence. For harmony of analysis, we will address these assignments of error together.

{¶ 73} As the legal concepts of sufficiency of the evidence and manifest weight are " 'quantitatively and qualitatively different,' " they require two distinct legal standards. *State v. Vinson*, 10th Dist. No. 19AP-574, 2022-Ohio-2031, ¶ 23, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Sufficiency of the evidence is a question of law that examines whether the state's evidence meets a " 'test of adequacy.' " *Id.* " ' "[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' " *State v. Moore*, 10th Dist. No.

---

[11] We note that appellant does not contest that there was sufficient evidence in the record, or that the conviction was not against the manifest weight of the evidence, to support appellant's conviction for tampering with evidence in violation of R.C. 2921.12, a felony of the third degree.

20AP-209, 2022-Ohio-1732, ¶ 12, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Further citations and quotations omitted.) *Moore* at ¶ 12. If reasonable minds could reach different conclusions as to whether each element of a crime was demonstrated beyond a reasonable doubt, a trial court cannot order an entry of acquittal. *Moore*, quoting *State v. Bridgeman*, 55 Ohio St.2d 261 (1978), syllabus.

{¶ 74} Conversely, when considering a manifest weight argument, an appellate court evaluates the evidence as an additional, or "thirteenth juror." *Vinson* at ¶ 24, citing *Thompkins* at 387. Upon a manifest weight standard of review, an appellate court considers whether there is sufficient competent, credible evidence to support the jury's verdict. *State v. Hoyle*, 10th Dist. No. 21AP-610, 2022-Ohio-3065, ¶ 16, citing *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. " 'To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial.' " *State v. Erb*, 10th Dist. No. 21AP-402, 2022-Ohio-3797, ¶ 27, quoting *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387.

{¶ 75} The jury is the primary determinator of credibility and weight of a witnesses' testimony. *Erb* at ¶ 28, citing *State v. Craig*, 10th Dist. No. 21AP-468, 2022-Ohio-1219, ¶ 18, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. A jury is free to "believe all, part, or none of a witness's testimony." (Internal citations and quotations omitted.) *Erb* at ¶ 28. Reversal on manifest weight of the evidence grounds is reserved for only the most " 'exceptional cases.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 76} R.C. 2903.02(A) states, in pertinent part, "[n]o person shall purposely cause the death of another." R.C. 2903.02(B) states "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section

2903.03 or 2903.04 of the Revised Code." At trial, the state argued appellant was guilty of murder in Count One claiming that on August 12, 2019, appellant purposefully caused the death of Fletcher. In Count Two, the state alleged that appellant caused the death of Fletcher as a proximate result of committing or attempting to commit felonious assault, an offense of violence, in violation of R.C. 2903.11. There was extensive testimony at trial to support the jury's finding of guilt on both counts.

{¶ 77} Atchley testified that he resided at 380 Stoddart Avenue in the summer of 2019. On August 12, 2019, at approximately 9:30 p.m., Atchley was reading a book on his porch when he "started hearing events going on next door." (Tr. Vol. I at 50.) Atchley heard two male voices yelling at each other for approximately 15-20 minutes. (Tr. at 51.) "The only phrase that I could make out was, '$400.' " (Tr. at 51.) After interacting with his neighbors earlier in the evening, Atchley was in his basement when he heard someone yell "help me" outside as they were running up the alleyway. (Tr. at 56.) Atchley testified that he told his roommate to call 911 and observed a "pool of blood on my front porch[.] * * * I saw Ce'Marlo out moving toward the street, and he stumbled and was falling in the tree lawn * * * near a parked car and out in our front lawn." (Tr. at 59.) Atchley attempted first aid and he put pressure on Fletcher's wounds. (Tr. at 60-61.) According to Atchley, the only thing Fletcher would say was "PS4." (Tr.at 60.)

{¶ 78} Hill testified that she responded to a call at Stoddart Avenue on August 12, 2019. Hill and her partner arrived at the scene and identified a victim on the ground. (Tr. at 84.) Hill described the victim's injuries as "[t]o his torso, initially we believed it would be gunshots, but, I -- I couldn't tell you exactly where they were in his torso." (Tr. at 87.) Hill testified that she attempted to speak with the victim, but he was unresponsive. (Tr. at 95-96.) Hill testified that she went inside the home and observed more blood that was "[b]asically everywhere." (Tr. at 88.)

{¶ 79} Harmon testified that he entered the residence believing there was an armed suspect. (Tr. at 109-10.) According to Harmon, he followed a trail of blood going up the stairs. (Tr. at 110.) Harmon characterized the scene as "very, very apparent that something, a crime of violence had occurred inside the living room." (Tr. at 112.) Harmon stated they searched the first half of the duplex and discovered the attic was shared with the other unit so he wanted to search the other side of the building. In the course of searching the attic of

the other unit, Harmon "moved back the piece of wood that was, I guess, acting as the door, and I saw the suspect or who I thought to be the suspect at the time hiding in there." (Tr. at 116.) Harmon testified that he observed that the suspect had blood on his shirt. Harmon ordered the suspect out, to turn around, and put his hands up. (Tr. at 119.) Mottinger testified that, at the time of the arrest, he did not observe any injuries on the suspect and that Huish looked impaired. (Tr. at 167.) Mottinger observed two bottles of liquor in the attic and smelled alcohol on Huish during the arrest. (Tr. at 172, 180.)

{¶ 80} Jenkins testified that he performed an autopsy of the decedent, Ce'Marlo Fletcher, on August 13, 2019. (Tr. at 192.) According to Jenkins, Fletcher had injuries "on the left upper chest consistent with a stab wound. And there was medical intervention to include sutures across the chest, and the -- some scattered abrasions, bruises, scrapes on knees." (Tr. at 196.) Jenkins found, based on a reasonable degree of medical certainty, that the decedent's cause of death was a stab wound to the chest and concluded the manner of death was a homicide. (Tr. at 214.)

{¶ 81} Jury testified that she moved into the 382 Stoddart Avenue duplex in 2017. According to Jury, everyone got along for the most part with no major problems in the house. (Tr.at 256.) On August 12, 2019, Jury worked an evening shift at BP between the hours of 10:00 p.m. to 6:00 a.m. (Tr. at 259.) According to Jury, Fletcher called her around 9:30 p.m. inquiring about his missing PlayStation 4.  After some discussion with Fletcher, they determined that her boyfriend had likely taken the PlayStation 4. (Tr. at 266.) Jury testified that she later got a notification on her phone of a shooting on Stoddart Avenue. (Tr. at 267.) Jury stated that while Fletcher was taller than Huish, Huish was noticeably heavily than Fletcher. (Tr at 269-70.) Gibson testified that he moved into the Stoddart Avenue residence in 2016. (Tr. Vol. III at 71.) On August 12, 2019, Gibson testified that he went to the Stoddart Avenue property around 7:30 p.m. to pay his rent and return a video game from Fletcher. Gibson went to Fletcher's room and noticed that the PlayStation 4 was missing. According to Gibson, he left the residence around 8:30 p.m. (Tr. at 91.) Gibson stated that he received a call from Fletcher around 9:10 p.m. (Tr. at 92-93.) Gibson testified that Fletcher was pretty upset about the missing PlayStation 4. Gibson stated that was the last time he spoke with Fletcher. According to Gibson, he received a call from Jury the next morning, and she told him what had happened. (Tr. at 95.)

{¶ 82} Olson is a forensic scientist in the DNA Section of the Columbus Police Crime Lab. Olson testified to the process of analyzing DNA and what information is included in a DNA profile. (Tr. at 118-19.) Regarding the August 12, 2019 incident, Olson stated that the swabs tested from the blade of the knife were consistent with the DNA profile of Fletcher. (Tr. at 125.) Olson also concluded that the DNA profile from the stain on Huish's shirt was a mixture of Huish and Fletcher. (Tr. at 130, 132.)

{¶ 83} Close testified that he interviewed Huish about the incident at CPD headquarters. (Tr. at 167.) Huish stated that Fletcher came home from work and accused him of stealing his PlayStation 4. "He said that Mr. Fletcher was very angry, yelling and screaming." (Tr. at 167.) Close testified that after several back-and-forth arguments, Fletcher pushed Huish multiple times. Huish stated that he then grabbed a butcher knife from the kitchen and "chased Mr. Fletcher to the front door. Once [in the living room near the front door], * * * he was telling Mr. Fletcher to get away from him and to get out of his house." (Tr. at 168.) Close stated that Huish claimed "Mr. Fletcher pushed [him] again and/or that was when he struck him. And then during that altercation in the living room Mr. Huish stated that he stabbed Mr. Fletcher with a knife." (Tr. at 168-69.) Huish acknowledged during the interview that he did not see a weapon on Fletcher. (Tr. at 169.)

{¶ 84} Therefore, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the state demonstrated all of the essential elements of the murder beyond a reasonable doubt.

{¶ 85} As to appellant's argument that reversal was warranted on manifest weight grounds, after a careful review of the transcript and evidence at trial, we find there is sufficient competent, credible evidence to support the jury's verdict. In addition to the evidence provided in the sufficiency analysis, there was ample testimony to support the conclusion that the state disproved, beyond a reasonable doubt, at least one element of self-defense.

{¶ 86} The state and appellant presented far different accounts of the incident on August 12, 2019. At trial, Huish testified that he never threatened Fletcher with a knife or chased him into the living room. (Tr. Vol. IV at 67, 86.) Huish did, however, acknowledge telling Fletcher to get out of the house. According to Huish, after several arguments throughout the evening, Fletcher started to grab his shirt saying he owed him money. (Tr.

at 74.) Huish testified that Fletcher then hit him on the side and was up against the wall on top of the bed. According to Huish, he was terrified and "thought he'd kill me." (Tr. at 75-76.) "All I remember is I grabbed that knife and I hit it -- I hit him with it." (Tr. at 75.) Huish then "freaked out and I just ran out of the room" to the other unit because he believed that Fletcher would not look for him there. (Tr. at 76, 79, 81.) Huish testified that he did not have any other choice but to use the knife. (Tr. at 87-88.)

{¶ 87} The state, however, addressed many of these claims on cross-examination. First, Huish conceded that he did not know Fletcher very well and did not have a great frame of reference for his emotions. (Tr. at 95.) Huish testified that he started drinking around 4:00 p.m. and acknowledged there was an empty bottle of liquor on the kitchen counter. (Tr. at 102.) Huish conceded that he told police, "I wish I wouldn't have had a few cocktails, I wouldn't be here." (Tr. at 105-06.) Huish acknowledged that he was not generally afraid of Fletcher or had to call the police on him in the past. (Tr. at 110.) Huish also conceded that his testimony at trial was the first time he said that he went into the living room before Fletcher. (Tr. at 115.) Huish also admitted that he told police that he could not remember when Fletcher punched him in the side, but he testified at trial that it was in the front room. (Tr. at 119.) While Huish does not recall telling police that he "chased Ce'Marlo into [the] front room," he admitted he made that statement to Close during the interrogation. (Tr. at 115.)

{¶ 88} Given the conflicts between Huish's statements to law enforcement immediately after the arrest and at trial, the jury, as the trier of fact in this case, is best positioned to make determinations of credibility and weight of the testimony. *State v. Messenger,* 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 47, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Accordingly, the jury may consider any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Therefore, in light of the evidence discussed above, as well as the record in its entirety, we do not find the jury clearly lost its way concluding that Huish murdered Fletcher and that he was not acting in self-defense.

{¶ 89} Accordingly, we overrule appellant's sixth and seventh assignments of error.

**E. Appellant's Fourth Assignment of Error**

{¶ 90} In appellant's fourth assignment of error, he argues that his trial counsel was ineffective by failing to object to the alleged issues in the jury instructions and verdict forms.

{¶ 91} The United States Supreme Court has set forth a two-part test to address issues of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). In *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), the Supreme Court of Ohio adopted the *Strickland* test to address whether an attorney's representation was ineffective. *State v. Leyh*, 166 Ohio St.3d 365, 2022-Ohio-292, ¶ 17, citing *State v. Simpson*, 164 Ohio St.3d 102, 2020-Ohio-6719, ¶ 14, *id*. at ¶ 23 (O'Connor, C.J., concurring), *id*. at ¶ 28 (Fischer, J., concurring).

{¶ 92} In order to bring a successful ineffective assistance of counsel claim, a defendant must demonstrate that the trial court's representation was objectively unreasonable deviating from the acceptable range of professionally competent assistance and was, therefore, deficient. *Strickland* at 687. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id*. at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). The second prong requires a defendant to demonstrate that the trial counsel's representation resulted in prejudice depriving the defendant of a fair trial. *Strickland* at 687. A defendant must show that, without the purported prejudice, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

{¶ 93} Appellant first argues counsel was ineffective by failing to request a separate finding on the issue of self-defense on the verdict forms. Appellant cites *State v. Reeds*, 11th Dist. No. 2007-L-120, 2008-Ohio-1781 in support of this claim. Upon review, we do not find that failing to include self-defense language in the verdict forms was necessarily ineffective assistance of counsel. The verdict forms at issue do not mention self-defense but indicate a finding for each charge and a space for "guilty" or "not guilty." The instructions, however, state, "[i]f you find that the State proved beyond a reasonable doubt all of the elements of Murder and that the State proved beyond a reasonable doubt that self-defense

does not apply, you must find the defendant guilty according to your findings." (Jury Instructions at 10.) It is clear the instructions at issue inform the jury that a finding of guilty would indicate that they believed that the state proved that self-defense did not apply. Even without a separate verdict form on self-defense, the jury was aware that it was free to consider it in their deliberations. As such, the rejection of a self-defense argument is inherent in a guilty verdict. *State v. Ellis*, 8th Dist. No. 109408, 2021-Ohio-1297, ¶ 22. *See also State v. Jones*, 8th Dist. No. 108371, 2020-Ohio-3367, ¶ 94 (finding there was no error in the failure of counsel to ask for separate self-defense findings on a verdict form).

{¶ 94} Appellant's reliance on *Reeds* is misplaced. The Eleventh District Court of Appeals, in fact, reached the same result as we did in this case concluding that the exclusion of self-defense on the verdict form was not in error. Like *Reeds*, appellant, by admitting to killing the victim and presenting a self-defense argument, "the only conclusion that could be drawn through a finding of 'not guilty' " is that Huish stabbed Fletcher in self-defense. *Id.* at ¶ 62. While the inclusion of self-defense on the verdict forms would have provided some clarity, here, we cannot say its absence of such language was deficient. Moreover, we cannot find that the exclusion of such language resulted in a reasonable probability to undermine the confidence in the outcome of the trial.

{¶ 95} Appellant also alleges counsel was ineffective for failing to object to various provisions in the jury instructions. This issue was extensively examined in our analysis in Section B of this decision. After review of the record, we need not examine whether counsel was ineffective as appellant cannot succeed in the second prong under *Strickland* demonstrating that there was a reasonable probability that, but for the ineffective error of counsel, the result would have been different. As discussed at length in this decision, the state presented ample support for finding appellant guilty of murder.

{¶ 96} Accordingly, appellant's fourth assignment of error is overruled.

## IV. CONCLUSION

{¶ 97} Having overruled appellant's seven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, P.J. and KLATT, J. concur.

_____